FILMS BY JOVE, INC., and
Soyuzmultfilm Studios,
Plaintiffs,

v.

Joseph BEROV, Natasha Orlova, The
Rigma America Corporation, Saint
Petersburg Publishing House and
Group, Defendants.

No. CIV. A. 98–CV–7674 (DGT).

United States District Court,
E.D. New York.

Aug. 27, 2001.

Julian H. Lowenfeld, New York City.

Kenneth A. Feinswog, Los Angeles, CA.

Paul R. Levenson, Kaplan, Gottbetter & Levenson, LLP, New York City.

Robert W. Clarida, Cowan, Liebowitz & Latman, P.C., New York City.

## MEMORANDUM AND ORDER

TRAGER, District Judge.

In December of 1998, plaintiffs Films by Jove ("FBJ") and Soyuzmultfilm Studio ("SMS"[1]) (collectively, "the plaintiffs" or "the third party defendants") brought this action for copyright infringement, breach of contract, unfair competition and RICO violations against Joseph Berov, Natasha Orlova, Rigma America Corporation and the St. Petersburg Publishing House and Group (collectively, "the defendants"). On May 4, 1999, this court issued a preliminary injunction on consent of the defendants restraining them from reproduction of any motion picture in which plaintiffs own the copyright. On August 10, 2000, plaintiffs moved to hold the defendants in contempt for violating and continuing to violate the court's injunction by selling copyrighted material allegedly belonging to the plaintiffs[2] out of their St. Peters-

1. "Soyuzmultfilm Studio" (or "Soyuzmultfilm Studios," as it is referred to by some of the affiants and in certain documents) was a name used by a Soviet state enterprise in existence since 1936, a lease enterprise in existence between 1989 and 1999 and the joint stock company named as a plaintiff in this suit. Since the question of whether there is a direct line of succession from the state enterprise to the lease enterprise to the joint stock company is at the heart of this litigation, the abbreviation "SMS" will be used to designate only the plaintiff joint stock company. The other forms of Soyuzmultfilm Studio will be referred to by the full name, along with any additional explanatory information necessary to impart clarity to the discussion.

2. These materials are animated films made between the years 1946 and 1991. Specifically, the titles at issue in this litigation, in Russian and English, are: Bitva (Battle), Ptitchka Tari (Bird Tari), Kanikuli Bonifatsia (Bonifasia's Holidays), Hrabrets Udalets (Brave and Fast One), Priklucheniya Buratino (Buratino), Kentervilskoye Privedenie (Canterville's Ghost), Cheburaska (Cheburaska), Zolushka (Cinderella), Chipollino (Cipollino), Zhuravliniye Peria (Crane Feathers), Krokodile Ghena (Crocodile Genady), Skaska Tzareh Saltan (Czar Saltan), Skaska o Mertvoy Sarevne 7 Ragatiriah (Dead Princess and 7 Strong Men), Ded Moroz i Seriy Volk (Father Frost and Grey Wolf), V Yarange Gorit Ogon (Flame Burns in Igloo), Foca na Vse Ruki Doka (Foca the Handyman), Tsarevna Liagushka (Frog Princess), O Tom Kak Gnom Pokinul Dom (Gnome Who Left Home), Shaibu! Shaibu! (Goal! Goal!), Zolotaya Antelopa (Golden Antelope), Skaska o Zolotom Petooshke (Golden Rooster), Koniok Gorbunok (Humpback Horse), Ibolit i Barmaley (Iboleet and Barmoley), V Nekotorom Tsarsive (In Some Kingdom), Pokhischenie (Kidnapping), Poslednaya Ohota Akeli (Last Hunt of Akela), Parozik iz Romashkova (Locomotive from Romashkov), Match Revansh (Match Revenge), Maugli (Maugli), Rusalochka (Mermaid), Novogodnee Puteshestvie (New Year Journey), Shelkunchik (Nutcracker), Petia i Krasnaya Shapochka (Peter and Red Riding Hood), Aleniky Tsvetochuk (Pink Flower), Poni Begaet po Krugu (Pony Rides in a Circle), Mezha (Property Line / Dividing Line) Raksha (Raksha), Vozvraschenie k Ludiam (Return to the People), Shapocliak (Shapocliak), Pastushka i Trubochist (Shepherdess and Chimney Sweep), Serebrianoe Kopitse (Silver Hooves), Snegorochka (Snow Girl), Snegovik–Pochtovik (Snow Postman), Snezhnaya Koroleva (Snow Queen), Duimovochka (Thumbellina), Stoikiy Oloviannniy Soldatik (Tin Soldier), Dvendtsat Mesiatsev (Twelve Months), Ded Moroz i Leta (Uncle Frost in Summer), Dikie Lebedi (Wild Swans), Na Zadney Parte # 1 (At the Last Desk # 1), Hrabriy Olenionok (Brave Little Deer), Cheburashka Edot v Shkolu (Cheburashka is Going to School), Veselaya Karusel # 23 (Funny Merry–Go–

burg Publishing House retail stores in Brooklyn. A hearing on that motion was held on August 17 and August 18, 2000, but the issue was left undecided, and the hearing was adjourned until October 10, 2000 after it became apparent that a third party, the Federal State Unitarian Enterprise Soyuzmultfilm Studio ("FSUESMS" or "the third party plaintiff"), would be intervening in the lawsuit as a third party plaintiff, seeking declaratory and injunctive relief necessary to secure its right of operative management [3] of the copyrights to the films at issue, which, it claimed, were owned, strictly speaking, by the Russian government.[4] On October 10, 2000, the contempt hearing was continued. The defendants, at that time, conceded a violation of the injunction in the event that the plaintiffs do, in fact, possess the copyrights to the animated films sold by the defendants.

This same question of copyright ownership is now before the court. The plaintiffs have moved for summary judgment on this issue, and FSUESMS has cross-moved for summary judgment on its own claims to the copyrights.[5] The final resolution of the plaintiffs' contempt motion hinges on the disposition of the question of copyright ownership.

## Background

### (1)

The parties agree that in 1936, the Soviet government expropriated from the Russian Orthodox Church the premises of the Church of St. Nicholas the Enlightener in Moscow, Russia and founded there a state enterprise [6] called Soyuzmultfilm Studio,

---

Round 23), Meteor na Ringe (Meteor in a Ring), Miss Noviy God (Miss New Year), Moroz Ivanovich (Uncle Frost), Kogda Zazhigautsia Yolki (When Xmas Trees Light Up). *See* Pl.'s Ex. F, attached to Decl. of Joan Borsten of Jan. 25, 2001.

3.  The notion of "operative management," akin to control without actual ownership, will be discussed more fully below.

4.  Joan Borsten, the director of FBJ, makes the accusation that the intervention of FSUESMS at this particular point in time was not a mere matter of chance:

    It is highly unlikely that [FSUESMS] legally retained the firm of Cowan, Liebowitz and Latman on August 11, 2000. Not only did [FSUESMS] not have legal standing on that day, but to the best of my knowledge it did not have the financial means to pay the retainer. I have personal knowledge that members of [FSUESMS] lack funds to make ends meet, are reduced to moonlighting jobs, and [FSUESMS] was unable to pay salaries of its employees in August, the very same month that—as Mr. Clarida[, the Cowan, Liebowitz and Latman attorney representing FSUESMS,] told our attorney—his firm had received a $20,000 retainer by wire transfer. I suspect that the

retainer was in some way either paid by Mr. Berov or a company fronting for him. Decl. of Joan Borsten of Sept. 22, 2000 [hereinafter "Sept. 22 Borsten Decl."], Ex. 20, attached to Decl. of Julian Lowenfeld, ¶ 26. Although a majority of Ms. Borsten's claims find support in the record—Mr. Clarida during oral argument, for example, did not deny that his legal fees were indeed being paid by Mr. Berov. *see* Tr. of Oral Arg. on June, 5 2001, I refuse to speculate about the motivations of FSUESMS in intervening in this proceeding.

5.  Although this dispute started out purely as an infringement action by FBJ against the defendants, it has become a full-fledged dispute about copyright ownership between FBJ / SMS and FSUESMS. FSUESMS, accordingly, will be bound by any finding this court should make with respect to the ownership of the copyrights.

6.  "State enterprises (associations), along with cooperative enterprises, are the basic unit of the single national-economic complex." The Legislation of Perestroika, Ex. 2, attached to the Decl. of Paul B. Stephan (Pl.'s Russian law expert) of Jan. 22, 2001 at 20.

    At the state enterprise, the labor collective, using public property as its proprietor, creates and augments the people's wealth and

which, from 1936 until the present, created about 1500 animated motion picture films, many of which became extremely popular.[7] *See* Mem. Law. Supp. Pls.' Mot. Dis. 3D Party Compl. Pursuant to FRCP 12(b)(6) [hereinafter "Pls.' Mot. Dis."] at 2; Notice of Mot. to Dismiss 3D Party Compl. Pursuant to FRCP 12(b)(6) [hereinafter "Pls.' Not. Mot. Dis."] at 2. From 1936 to 1989, Soyuzmultfilm Studio, like virtually all enterprises in the Soviet Union, operated as a state enterprise. *See* Pls.' Mot. Dis. at 2. Unfortunately, as far as the history of Soyuzmultfilm Studio goes, the parties agree on little else, although their disagreements, as the patient reader will discover, are either disputes as to issues of law or disputes about facts that are not dispositive on any of the issues resolved in this opinion.[8]

According to plaintiffs, on December 20, 1989, as part of the ownership liberalization trend that accompanied Glasnost and Perestroika, Soyuzmultfilm Studio became a "lease enterprise" or "rent entity."[9] *See* *id.* at 2–3. "Many state companies became rent enterprises in the late 1980s and 1990s. In accordance with law, they stopped to be 'state-owned', but having in mind a further transition to privately held companies, they acquired another legal status, taking on lease only state buildings and equipment, but keeping their income and products for themselves and thus they received freedom from the state." Pls.' Ex. 15, Decl. of Mila Straupe [hereinafter "Straupe Decl."] ¶ 11. The lease enterprise, operating under a ten-year lease agreement concluded with the Soviet State Film Committee known as Goskino,[10] paid rent to the state for facilities and equipment, while the copyrights to the films, which, in the plaintiffs' version of the story, originally belonged to the state enterprise, passed by operation of law from the no-longer-existent state enterprise Soyuzmultfilm Studio to the identically-named rent enterprise that took its place. *See id.* at 3; Pls.' Response to Def.'s and Third

ensures the combination of the interests of society, the collective and each worker. The enterprise is the socialist commodity producer; it produces and sells output, performs work and provides services in accordance with plan and contracts and on the basis of full economic accountability, self-financing and self-management and the combination of centralized management and the independence of the enterprise. *Id.*

7. "Soyuz" is the Russian word for "union," as in "Soviet Union;" "multfilm" is the Russian word for "animated film" or "cartoon." *See* Pls.' Not. Mot. at 2.

8. All of the facts necessary to the conclusions reached below are either conceded or undisputed, and there is not enough evidence for a reasonable jury to reach conclusions different from those reached by this court. In addition, the parties themselves do not point to any factual disputes that must be resolved by a finder of fact prior to a determination of this motion. Their approach to the briefing of the issues in the case consists almost entirely of experts battling over the proper legal consequences under Russian law that attach to facts which are undisputed.

9. The transformation was ordered on December 12, 1989 by Goskino, the Soviet State Film Committee:

In the interest of ideological and artistic and creative goals, for further strengthening of democratic principles in the management of film production, and for the purpose of further development of the principles of socialist self-administration, and full participation in initiatives, enterpreneurship and incentive of the labor collective of the [film studio Soyuzmultfilm], I hereby: ORDER to transfer [Soyuzmultfilm Studio] to lease as of December 15, 1989.

Ex. E, attached to Decl. of Sergey Skuliabin.

10. Goskino, meaning literally, "government film," is a government ministry generally charged, during the Soviet era, with overseeing all aspects of film production and internal distribution.

Party Pls.' Jnt. Statement Pursuant to Local Rule 56.1 [hereinafter "Pls.' 56.1 Resp."] ¶ 32; Straupe Decl. ¶ 12.

On July 1, 1999, shortly before the lease was due to expire, the rent entity Soyuzmultfilm Studio was again reorganized, this time into a private joint stock company.[11] *See* Straupe Decl. ¶ 12. That corporation, still named Soyuzmultfilm Studio, became the lawful successor to all of the rights and obligations of its predecessor, including, according to plaintiffs, all copyrights and trademarks. *See id.* The joint stock company, however, did not incorporate into its institutive capital the state-owned material assets, e.g., premises, equipment, furniture, etc., that had been leased to the rent enterprise by Goskino, and those state-owned assets reverted to the state upon the expiration of the lease term. *See id.* Accordingly, the joint stock company relocated in 1999 from its old offices in the Church of St. Nicholas the Enlightener to a new office in Krasnogorsk, a Moscow suburb. *See id.*

From the early nineties on, the lease enterprise and SMS, its successor, have had "to put up with a fight in Russia once spearheaded by Goskino and now [Sovek-sportfilm] and the State Property Ministry to take control of the films produced by the studios of Russia during the USSR." *See* Sept. 22 Borsten Decl. ¶ 6. The rights of the lease enterprise Soyuzmultfilm Studio and its successor, the joint stock company SMS, among other studios, were vindicated in various court decisions, *see* Decl. of Rimma Erokhina, Ex. 6, attached to Decl. of Julian Lowenfeld, most definitively in a June 19, 1996 decision of the Commercial Court of Paris, which ruled for Soyuzmultfilm Studio, Mosfilm Studio, Lenfilm Studio and Films by Jove and against Soveksportfilm, finding that economic legislation passed by the USSR in 1986 and thereafter had put an end to the state monopoly on foreign trade, and Soveksportfilm could no longer license films produced by Russian film studios without the agreement of the studios, which were the rightful copyright holders. *See* Ex. 14, attached to Decl. of Julian Lowenfeld. The French court noted a series of under-the-table transactions that Soveksportfilm had engaged in in order to transfer to itself, without consent, rights to 125 films owned by the studios.[12] *See id.*

---

11. Although the papers submitted in the case do not reflect it, it emerged during oral argument that the plaintiffs actually maintain that the lease enterprise may never have expired, and this has been the subject of a different series of Russian court decisions. *See* Tr. of Oral Arg. of June 5, 2001 [hereinafter "Oral Arg."] at 17–22. Despite being requested to do so, the plaintiffs submitted no court decisions reflecting this understanding. Without more evidence, it would be impossible for this court to decide the issue. Because all of the submissions in the case, both those of plaintiffs and those of FSUESMS, seem to operate on the assumption that the lease enterprise actually ceased to exist in 1999, when the lease term expired, that same assumption will be made throughout this opinion. Moreover, a resolution of this issue is not necessary to dispose of the case.

12. The court recites a series of transactions wherein Soveksportfilm illegitimately transferred rights through a series of companies it controlled in part or in whole:

Granted that it is established that the Studios, writers and producers are the sole copyright titleholders under Russian law and that in light of the (worldwide?) Universal Copyright Convention of 1952 it benefits them to apply the mechanisms of protection under French law: that [Soveksportfilm] was in any case bound to respect the contracts of mandate they had enter [sic] into with the Studios; Granted that it is established and recognized by the parties that neither the clause of the contract between [Soveksportfilm] and Cosmos, signed October 31, 1988, and which extends until October 31, 1989 the concession of rights on 20 films, nor the October 14, 1989 contract by which Cosmos ceded its exploitation rights on a catalogue of 125 films

Around the same time that SMS was leaving its Church of St. Nicholas the Enlightener location, then-Prime Minister Sergei Stepashin, responding to the demands of Goskino and a faction of approximately fifty people displeased with the leadership of a certain Mr. Skuliabin (spelled elsewhere as "Sculabin"), the director of the lease enterprise Soyuzmultfilm Studio as of 1993,[13] issued a decree recommending the creation of a new state enterprise for the exploitation of the Church of St. Nicholas facilities vacated by the joint stock company. *See* Pls.' Mot.

Dis. at 5; Pls.' Ex. 17 (hereinafter "Stephashin Order"); Tr. of Hearing on Aug. 17, 2000 at 20; Decl. of Vitoslav Shilobreev attached to FSUESMS's Order to Show Cause.[14] On October 11, 1999, that faction of SMS officers who had been unsuccessful in their attempts to be elected to SMS's governing board proceeded to register the newly-organized "Federal State Unitarian Enterprise Soyuzmultfilm Studio."[15] *See id.*

Meanwhile, the Russian Orthodox Church had initiated a lawsuit to reclaim

---

to Inter–Audio, nor the October 20, 1989 sales mandate from Inter–Audio, nor the October 20, 1989 sales mandate from Inter–Audio to UGC D.A., nor the contribution in kind made by both Inter–Audio and by [Soveksportfilm] at the time of the formation of Parimedia on November 25, 1989, nor the extension of rights granted on this occasion by [Soveksportfilm] on the catalogue of 125 films, with [Soveksportfilm] renouncing the payments that it was its legal right to receive, nor the March 19, 1993 sales mandate from Parimedia to UGS D.A. nor the ceding of rights from Parimedia to LA Copagnie Des Films on December 30, 1994, were ever mentioned to the Studios nor were ever approved by them;

Granted that on numerous occasions manifest fraud was committed against the Studios and the Films by Jove company, license holder of rights from [Soyuzmultfilm Studio].
*Id.*

**13.** The leader of that faction and current director of FSUESMS, E. Rahimov, had been serving as Deputy Director of the lease enterprise Soyuzmultfilm Studio until he was fired in August, 1999. *See* Decl. of Sergey Skuliabin ¶ 6.

**14.** The accuracy of the Shilobreev Declaration has been questioned by the plaintiffs, who note that Shilobreev's first name is actually Vyacheslav, not Vitoslav, and that, despite the fact that Shilobreev speaks not a word of English, the declaration is written entirely in English and signed by Shilobreev with no Russian original having been offered. *See* Straupe Decl. ¶¶ 4–5. Shilobreev, it should be noted, is the head of the board of directors of FSUESMS. In addition, Joan Borsten, the

director of Films by Jove, contends that Shilobreev

used a third party's corporate seal at the bottom of his declaration. Perhaps this detail is not significant in the U.S.[,] but in Russia corporate seals are so respected and essential to doing business that they are kept under lock and key, and misuse of a corporate seal is a criminal offense. Affixing them to a legal document is considered the ultimate confirmation of legitimacy and authentication. Mr. Shilobreev could not stamp his declaration with the corporate seal of [FSUESMS] as that company did not legally exist at the moment he wrote his declaration as its "Deputy Director." So instead he affixed the declaration with the corporate seal registered to another company altogether, strangely enough a non-profit organization.

Sept. 22 Borsten Decl. ¶ 28.

**15.** FSUESMS was specifically contemplated by the Stepashin Order:

In view of the fact that in December, 1999 the term of the lease contract for the Soyuzmultfilm facilities and equipment belonging to the state shall expire[,] the Government accepts the proposal by the Ministry of Property of Russia to include said facilities and equipment into the base assets of newly formed state unitary enterprise Film Studios Soyuzmultfilm of Goskino of Russia.

Ministry of State Property together with Goskino of Russia shall determine the inventory of the state property to become assets of the federal state unitary enterprise Film Studios "Soyuzmultfilm."

Stepashin Order.

the property that had been expropriated from it in 1936. *See id.* According to the plaintiffs—and, it should be reiterated, everything discussed heretofore and postdating the creation of the lease enterprise is the plaintiffs' version of the facts— FSUESMS, faced, by virtue of the Church's claims, with the loss of its only assets, viz., the premises and their facilities, decided to make a unilateral claim that it, and not the joint stock company SMS, was the "real" Soyuzmultfilm Studio. *See id.* To accomplish this end, FSUESMS, working closely with Goskino and the State Ministry of Property, *see* Sept. 22 Borsten Decl., advanced the contention that the lease enterprise Soyuzmultfilm Studio either had never existed or, at the very least, had not taken possession of anything other than the material assets of the state enterprise Soyuzmultfilm Studio and further, that the state enterprise had continued to exist in a latent, non-functioning form during the entire pendency of the lease (1989–1999). *See* Straupe Decl. ¶ 15. FSUESMS then, instead of attempting to register as a new company, requested to register as an amended form of the non-existent state enterprise Soyuzmultfilm Studio. It proceeded to request to register amendments to the extinguished charter of the state enterprise Soyuzmultfilm Studio, which had ceased to exist in 1989. *See id.* ¶ 16. These amendments were mistakenly and illegally registered by the Moscow City Registration Chamber in October of 1999. *See id.* ¶ 17. Thus, by the close of 1999, two independent enterprises, SMS and FSUESS, were both registered by the government and both claimed to be the rightful heirs of the state enterprise Soyuzmultfilm Studio and its extensive film library.

So much for the plaintiffs' version of Soyuzmultfilm Studio's colorful history. The defendants and FSUESMS offer a fundamentally different account.[16] According to them, the copyrights in the films made by the state enterprise Soyuzmultfilm Studio belonged at all times to the Soviet state and were merely under the operative management of the state enterprise Soyuzmultfilm Studio. *See* Mem. Law. Opp. Mot. for Partial Sum. J. by Pls./3rd Party Defs. and Supp. Cross–Mot. for Sum. J. by 3rd Party Pl. [hereinafter "FSUESMS's Cross–Mot."] at 2. The state enterprise administered those copyrighted films on behalf of the state and Goskino, the state agency responsible for managing the funding for state film production. *See id.* at 3.

The creation of the lease enterprise Soyuzmultfilm Studio in 1989 as part of the restructuring of the Soviet economy did not terminate the existence of the state enterprise Soyuzmulfilm Studio. *See id.* at 4. Rather, the state enterprise had suspended film production during the period of the lease. *See id.* The lease itself, entered into with the lease enterprise Soyuzmultfilm Studio by Goskino, as the funding entity for stateowned film assets, transferred to the lease enterprise only material assets, viz., the premises and equipment, located at the site of the Church where the state enterprise had heretofore been active. *See id.* at 3. The copyrights to the state enterprise's film library continued to be owned by the state. *See id.*

In 1994, the "state enterprise" form was abolished and replaced by a similar "state

---

**16.** The defendants and FSEUSMS agree on substantially all the facts of the case and many of their submissions to the court are jointly filed. The reader should assume, except where an indication to the contrary has been specifically noted, that there is no difference between their positions.

unitarian enterprise" form by the Civil Code of the Russian Federation, First Part (1994), and the state enterprise Soyuzmultfilm had to be restructured accordingly. *See* Maggs Decl., attached to FSUESMS's Not. of Cross–Mot. and Cross–Mot. for Sum. J. [hereinafter "Maggs Decl."] at 5 (Peter B. Maggs is defendants'/FSUESMS's Russian law expert). This restructuring was effectuated in 1999 when FSUESMS was created by order of Prime Minister Stepashin and registered soon thereafter. *See* FSUESMS's Cross–Mot. at 4. Also in 1999, "certain employees of the lease enterprise formed a fully private joint-stock company ... also calling itself 'Soyuzmultfilm Studios.'" *Id.* That company proceeded to claim itself as the rightful successor to the lease enterprise and the rightful owner of the copyrights in the film library created during the era of the state enterprise's active operation. *See id.*

At this point, the narratives of the parties begin to converge. A series of lawsuits ensued between SMS and FSUESMS, with each trying to nullify the registration of the other. Although the validity of corporate registrations and not the ownership of copyrights was the central issue being decided, some of these cases found occasion to address the possession of the copyrights in the state enterprise Soyuzmultfilm Studio's library. The decisions of lower courts,[17] which ruled in favor of SMS, found that the right to the copyrights in the films and trademark in the name Soyuzmultfilm Studio, among other intangible assets, passed to the lease enterprise by operation of law and was legitimately transferred to the joint stock company SMS when the lease enterprise sold its assets to that newly-formed entity prior to the expiration of the lease term. *See* June 5, 2000 Decision, Ex. 19, attached to Decl. of Julian Lowenfeld [hereinafter "Jun. 5 Dec."]; June 24, 2000 Decision, Ex. 20, attached to Decl. of Julian Lowenfeld [hereinafter "Jun. 24 Dec."]. In addition, these decisions found no connection between the 1936 State Enterprise Soyuzmultfilm Studio and its purported 1999 resurrection in the form of FSUESMS. *See id.* Accordingly, the FSUESMS's registration was cancelled. *See id.*

However, these decisions[18] were vacated by the Federal Arbitrazh Court for the District of Moscow, which premised its conclusions on the failure of the lower courts to consider evidence that the copyrights and other non-material assets of the state enterprise Soyuzmultfilm Studio may

---

**17.** Various exhibits submitted by the parties refer to the Russian courts involved in the dispute by various names. Fundamentally, the system appears to have the following structure: a lower court level, an appeals court level, a second appellate level in the Federal Arbitrazh Court for the District of Moscow and a final appellate level in the Higher Arbitrazh Court of the Russian Federation.

**18.** There are actually six decisions of relevance, three in a suit initiated by SMS against FSUESMS and three in a suit initiated by FSUESMS, the Ministry of State Property of the Russian Federation and Goskino against SMS. *See* FSUESMS's Cross–Mot. at 4. Each series of decisions consisted, first, of a lower court finding in favor of SMS and a confirmation of that ruling on appeal. *See id.* Both sets of decisions were vacated by the Federal Arbitrazh Court for the District of Moscow, those in the suit by FSUESMS against SMS by an August 18, 2000 opinion discussed in the text below and those in the suit by SMS against FSUESMS by a September 25, 2000 order that gave no reason for the remand but was presumably based on grounds similar to those articulated in the August 18 decision. *See* Aug. 18, 2000 Decision, Ex. 18, attached to Decl. of Julian Lowenfeld [hereinafter "Aug. 18 Dec."]; Sept. 25, 2000 Decision, Ex. G, attached to Decl. of Decl. of Robert W. Clarida [hereinafter "Sept. 25 Dec."].

have belonged to the state at the time that Goskino concluded the lease agreement with the lease enterprise and that these assets, consequently, never passed to either the lease enterprise or to the joint stock company:

> The lease enterprise "Studio Souzmult-film" [sic] was established on the basis of a rent agreement without the right to purchase all the property of the enterprise, which was state-owned. Moreover, the composition and the quantity of the property subject to be rented out was not identified, because the transference-acceptance act was never recorded and documents listing the property were never produced.
>
> In the process of transferring the leased enterprise to a joint-stock company it was necessary to separate the property of the enterprise from the property owned by the state and include in a separate balance sheet. Furthermore, the separate balance sheet was worked out independently by the leased enterprise, without the participation of the owner, who leased out the enterprise. This balance was then not presented to the owner for approval.

.    .    .    .    .

The Court when settling the dispute did not consider the fact if the act of transference can be considered accurate, which defined the size of the Charter capital of the joint-stock company and identified the size of the property owned by the state. The issue is if the leased enterprise has the right to independently and without the approval of the property owner to transfer according to the act of transference to the joint-stock company the property that does not be-

long to it. The Court also ignored this fact.

The decision reached by the Court that the Charter capital did not include state-owned property was based on incomplete evidence.

The conclusions of the Court that the property acquired in 1990–91 was not state-owned was not based on factual evidence.

Aug. 18 Dec.[19]

Importantly, on September 19, 2000, the Higher Arbitrazh Court of the Russian Federation denied SMS a further appeal at the current time but instructed, for the purposes of remand, that the August 18, 2000 opinion of the Federal Arbitrazh Court for the District of Moscow, quoted above, is not a binding view of the evidence in the case, and the lower court should allow SMS to argue its position on remand. Arifulin Letter, Ex. 7, attached to Decl. of Paul Stephan.

On remand, the Moscow Region Arbitrazh Court issued an opinion on December 26, 2000 in the suit by FSUESMS, the Ministry of State Property of the Russian Federation and Goskino against SMS. That opinion, by and large, reinstated and expanded upon the earlier lower court findings:

> According to Article 486 of the RSFSR Civil Code which was in effect at the time of the transformation of the state enterprise, "Film Studios Soyuzmultfilm" into a lease enterprise with the identical name, the copyrights to a film belong to the enterprise that shot the film.
>
> According to Article 498 of the RSFSR Civil Code, copyrights of an organization do not have term limitation.

---

**19.** There will be instances of awkward phraseology that recur within quotations from translated text throughout the opinion. The "[sic]" designation will not be used in such instances.

When the organization is transformed the copyrights shall be transferred to the successor organization.

Therefore, copyrights to animated films created by the state enterprise "Film Studios Soyuzmultfilm" were transferred by operation of law to its successor—[l]ease enterprise "Film Studios Soyuzmultfilm." A lease enterprise with an identical name became the successor of rights of the state enterprise "Film Studios Soyuzmultfilm" according to the existing laws, i.e., Article 16 of the ... Fundamental Principles [of][L]egislation and Union Republics on Lease.

Copyrights were not and could not be transferred by the lease agreement because they had been transferred by operation of law and cannot be limited by an agreement.

Therefore, the copyrights of the lease enterprise are not related to the issues of the lease agreement, and the expiration of that agreement does not cause the copyrights of the [l]ease enterprise "Film Studios Soyuzmultfilm" to expire.

At the time of the transformation of the [l]ease enterprise into a [shareholding] company[,] the lease enterprise had the copyrights to its animated film[s] by law.

.    .    .    .    .

Pursuant to Article [486] of the RSFSR Civil Code, copyright in the animated feature films belonged to "Film Studios Soyuzmultfilm" and not to Goskino USSR or any other representative of the state.

According to RSFSR Article 496 the copyrights to the animated feature films made by "Film Studios Soyuzmultfilm" belonged to the Studio without time limit, and upon its reorganization, the copyrights went to [l]ease enterprise "Film Studios Soyuzmultfilm" also with no term limitations.

Thus Goskino of the Russian Federation could not have transferred copyrights of the animated movies of "Film Studios Soyuzmultfilm" to the Lease Enterprise for lease because Goskino never had those rights to begin with.

.    .    .    .    .

[FSUESMS's] argument that the copyrights to the animated films belong to [it] has no foundation, based on the submitted documents and oral arguments of both sides in the lawsuit, because, pursuant to Articles 23, 37 of the RSFSR Civil Code and Article 11 of the Fundamentals of Civil Legislation USSR and Republics, a state enterprise, after leasing out an enterprise and complex of facilities and property, could not exist anymore, and could no longer be a legal person at the same time because it did not have its own property and legal capacity.

When leasing out an enterprise (state property) [takes] place in accordance with paragraph 4, Article 16 of the Fundamental Principles on Lease, which established full succession of rights to the state enterprise assumed by the [l]ease [e]nterprise, then according to Article 37 of the RSFSR Civil Code[,] this action shall constitute an actual reorganization of a state enterprise.

Dec. 26, 2000 Dec., Ex. 8, attached to Decl. of Paul Stephan [hereinafter "Dec. 26 Dec."].

The December 26 decision was affirmed on appeal on January 22, 2001. However, on April 20, 2001, well after the motion in this case had been submitted, the Federal Arbitrazh Court for the District of Moscow, the same court that had earlier remanded the case, issued a ruling overturning the December 26, 2000 and January 22, 2001 decisions. *See* Apr. 20, 2001 Ruling

[hereinafter "Apr. 20 Dec."], attached to Aff. of Vladimir Zlobinsky of May 9, 2001.

That ruling began the core of analysis by noting that Article 59 of the Civil Code of the Russian Federation provides that the act transferring property from one owner to another is the document that "defines the scope of rights and obligations being transferred to the respective recipient of rights." *Id.* at 5. But, in this case, because that transfer document is signed only by the deputy director of the lease enterprise and not signed at all by the general director of the joint stock company, it is "not deemed [to be] indisputable evidence establishing succession rights" from the lease enterprise to the joint stock company.

Accordingly, the court goes on to analyze the transfer in more detail:

> At the time of the creation of the leased enterprise "Film Studio Soyuzmultfilm" on the basis of the assets of the film studio, no determination was made as to the specific property to be transferred for lease and no property transfer and acceptance act was made. Therefore, it is impossible to determine which property was leased, and therefore impossible to determine the rights of the leased enterprise in respect of the state property subsequently transferred to the joint stock company.
>
> According to paragraph 1.2 of Charter of the leased enterprise the leased property remains property of the state. It is being utilized by the lessee.
>
> According to Article 295 of the Civil Code of the Russian Federation an enterprise has no right to sell the real property it is utilizing, to lease it . . . or to otherwise dispose of it without the owner's consent.
>
> Therefore, the court's conclusion that the property transfer act is not subject to approval by the State Property Ministry, which acts for the property owner, is not based in law. The consent of the owner of state property was never obtained[;] the evidence is missing in this case.
>
> Therefore, the leased enterprise, in violation of the aforementioned legal requirements, disposed of the state property by transferring it to the joint stock company.

*Id.* at 6. The court went on to nullify the joint stock company's registration. *See id.* at 7. As yet, although SMS represented at oral argument that they are appealing the decision to the Higher Arbitrazh Court of the Russian Federation, *see* Oral Arg. at 66, there has been no word about whether that court will accept the appeal or what the result of any such appeal will be.

However, this situation was significantly complicated by the other series of decisions in the case, the opinions on remand in the suit by SMS against FSUESMS. On January 25, 2001, the lower court refused to nullify FSUESMS's registration and found that

> the succession of rights of the lease enterprise from the state enterprise, as stipulated in Item 4, Article 16 of the Fundamentals of USSR law "On Leasing," arises not as a result of the conversion of the state enterprise into the lease enterprise, but by the operation of the agreement on lease of the property complex which definition is given in Article 132 of the Civil Code of the Russian Federation. Because the succession of rights is based on the lease agreement, it has a temporal nature and is restricted by the terms of such agreement. The succession of the lessee from a state enterprise can not continue after termination of the lease agreement because the lessee in this event, in accordance with Article 664 of the Civil Code of the Russian Federation, is obliged to return

the leased property of the state. In this case the term of the agreement on the lease of the property complex of the state enterprise expired on December 20, 1999.

Discussion of January 25, 2001 decision within Decision of April 3, 2001, Ex. B, attached to Decl. of Anya Zontova, at 2.

On appeal, the conclusion of the January 25, 2001 decision, viz., that the registration of the FSUESMS was not to be nullified, was upheld, but the appellate court, in a decision issued on April 3, 2001 specifically took issue with the bases for the January ruling:

> After examining all the case materials, including the arguments of appeals claims and listening to the representatives of the appellants participating in the case, the Appeals Court concluded that the Lower Court rightfully denied to satisfy the demands of the appealed claims[. H]owever, the Appeals Court cannot agree with the conclusions by the Lower Court in its decision denying the appeal. Thus, the Appeals Court considers as wrongful the Lower Court's statement that the succession of rights of the lease enterprise that was based on the lease agreement, has a temporal nature and is restricted by the term of such agreement. The Lower Court's conclusion does not comply with the law which was in effect at the time of concluding the agreement on the lease of the property complex of the state enterprise of December 20, 1989 . . . .
>
> Item 4, Article 16 of the Fundamentals on Leasing stipulates that a lease enterprise becomes the successor of material rights and obligations of the state enterprise leased by it, including its right to use land and other natural resources.
>
> After signing the agreement, the organization of lessees receives in the es-

tablished order the property of the state enterprise and acquires the status of a lease agreement.

> The fact of signing the lease agreement determines the formation of a lease enterprise. As it takes place, the activity of the state enterprise ceases through the conversion resulting from the formation of a lease enterprise on the basis of a state enterprise (Article 16 of the Fundamentals on Leasing.)
>
> Thus, after signing the agreement of December 20, 1989 by the USSR State Committee on Cinematography and the labor collective of [the state enterprise Soyuzmultfilm Studio], the activity of the state enterprise . . ., created by decree # 246/001 of June 10, 1936, ceased. By operation of law, the successor of rights of this enterprise became the lease enterprise [Soyuzmulfilm Studio], which later was converted into the joint stock company [Soyuzmultfilm Studio] and continues to be such at the present time.
>
> The Lower court's conclusion about the resumption of activity of the state enterprise [Soyuzmultfilm Studio] after the lease agreement ended, and returning to it the rights and obligations which have been passed on to the lease enterprise is erroneous, because the existing law does not stipulate the implementation of such a legal construct.
>
> The succession of rights is tightly linked with the legal capacity of a legal entity. It is an integral property of a legal entity, not of a leased property complex. Therefore when the property is returned after the agreement ended, there is no automatic return of the succession of rights and obligations.
>
> In addition, as it was mentioned previously, the state enterprise [Soyuzmultfilm Studio] ceased its activity by operation of law, for which reason any

resumption of specifically its activity is impossible.

Apr. 3, 2001 Dec., Ex. B, attached to Decl. of Anya Zontova [hereinafter "Apr. 3 Dec."] at 4–5.

The Appeals Court, however, went on to conclude that although SMS inherited the rights of the state enterprise after the expiration of the lease term, this did not mean that FSUESMS was invalidly registered. "The registration of the newly formed [FSUESMS] does not violate the Plaintiff's civil rights and interests protected by law," the court wrote. *Id.* at 5. FSUESMS's charter, the court found, did not specifically stipulate that it had inherited the rights of the state enterprise Soyuzmultfilm Studio, and a mere reference in Item 1.1 of that charter to the Order of 1936, which had created the state enterprise Soyuzmultfilm Studio, was not grounds to invalidate the registration. *Id.*

That decision, in turn, was appealed to the Federal Arbitrazh Court for the District of Moscow, the same court responsible for the April 20, 2001 reversal of lower court rulings in the suit brought by FSUESMS and others against SMS. This time, however, in a decision issued on June 4, 2001, the court affirmed the decision below. It summarized the holding below as follows:

> The Appeals Court has established that on December 20, 1989, the labor collective of the state enterprise [Soyuzmultfilm Studio] concluded the agreement with the USSR State Committee on Cinematography on the lease of the state enterprise property (case file 30–33, Vol. 1) after the signing of which, the activity of the state enterprise [Soyuzmultfilm Studio], created by decree of No. 246/001 of June 10, 1936 ceased.

> The successor of rights of this state enterprise by operation of law became the lease enterprise [Soyuzmultfilm Studio,] which later was converted into the joint stock company [Soyuzmultfilm Studio].

> The succession of rights, in the opinion of the Appeals Court, is tightly linked with legal capacities of a legal entity. It is an integral property of a legal entity, not a leased property complex. Therefore when the property is returned after the agreement ended, there is no automatic return of the succession of rights and obligations.

> However, the act of the registration by MRC of the [FSUESMS] on November 10, 1999, disputed by the Plaintiff, in the Appeals Court's view, does not violate the rights and interests of the Plaintiff, because the [FSUESMS] is a newly formed entity on the basis of the state property and does not affect the civil rights of the [joint stock company Soyuzmultfilm Studio] and its interests protected by law.

June 4, 2001 Dec., Ex. A, attached to Decl. of Anya Zontova [hereinafter "Jun. 4 Dec."] at 2–3.

The FSUESMS, according to the court, appealed the ruling in order to alter what the court described as "the motivational part" of the ruling, *id.* at 3, in other words, the reasoning underlying the decision, while SMS appealed the ruling that had allowed FSUESMS's registration to stand. *See id.* The court refused both appeals:

> The case materials show that on December 20, 1989 between USSR State Committee on Cinematography (lessor) and the labor collective of "Kinostudiya Soyuzmultfilm" (lessee) the lease agreement was concluded, under which the film studio were given for a lease use, for the term of 10 years, the main and circulating assets (equipment, appliances and other commodity and material assets) which were in the film studio's balance sheets at the moment the agree-

ment became effective, as well as the monies received from the centralized sources of funding under the plans of major construction work and material and technical procurement for the 12th and 13th five-year periods (Items 1.1, 5.6 of the Agreement). Pursuant to Item 1.2 of the Agreement, the leased property remains state property and in the economic management of the lessee. As this took place, the composition and the quantity of the leased property was not determined, because the receipt and transfer acts were not executed, and the documents identifying that property were not made.

The executive committee of the Moscow Sverdlovskiy regional council registered by the Decision of November 14 1990 the Charter of the lease enterprise [Soyuzmultfilm Studio] which was adopted on January 4, 1990 at the conference of the film studio labor collective.

Item 4, Article 16 of the Fundamentals of USSR law "On Leasing" stipulates that a lease enterprise becomes the successor of property rights and obligations of a state enterprise that was leased by it, including its rights to dispose of the land and other natural resources.

Thus, the Appeals Court has made the rightful conclusion that after signing the lease agreement, the activity of the state enterprise [Soyuzmultfilm Studio] created by decree No. 246/001 of June 10, 1936 ceased.

On October 11, 1999, a new legal entity was formed, the [FSUESMS].

This enterprise was created on the basis of the Order of the Russian Federation Government of June 30, 1999 No. 1038–R (Vol. 1, case file 80) in connection with the expiration in December 1999 of the term of the December 20,

1989 agreement with the labor collective of [Soyuzmultfilm Studio], on the lease of the film studio's assets which were in state property.

Pursuant to Article 13 of the Civil Code of the Russian Federation, a nonnormative act of a state body or a local government body is subject to being invalidated by the court in the event this act simultaneously does not comply with the law or other legal acts and it violates a legal entity's rights and interests protected by law. The court fully and thoroughly investigated the circumstances of the case, evaluated in the aggregate the arguments collected regarding the case, and came to a rightful conclusion that the registration of the newly formed [FSUESMS] does not violate the civil rights and interests of [SMS] protected by law.

In the Charter of the newly formed enterprise, the succession of rights from the state enterprise [Soyuzmultfilm Studio] is not stipulated.

The one and only indication in the Charter's Item 1.1 of the Order No. 246/001 of June 10, 1936 is not grounds for invalidating the registration of the state enterprise.

Considering the aforementioned statements, the Cassation Court finds that the Arbitrazh Court rendered the case full and comprehensive consideration, in compliance with the norms of the material and procedural laws.

*Id.* at 4–5.

As of time of the writing of this opinion, I have not received any information about possible appeals from this ruling. Therefore, at this time the ruling stands that the state enterprise Soyuzmultfilm Studio ceased to exist at the time of the formation of the lease enterprise, that a new entity, FSUESMS, was created in 1999 to take over the state property, i.e., material as-

sets, held by the lease enterprise for a ten-year period between 1989 and 1999 and that the other rights and assets belonging to the lease enterprise passed by operation of law to SMS, its successor, in 1999.[20]

(2)

On May 22, 1992, an agreement was signed between the lease enterprise and a California corporation called Films by Jove, Inc. by which the parties agreed, in exchange for valuable consideration, to make the latter the exclusive licensee worldwide for the Soyuzmultfilm film library. *See* Pls.' Mot. Dis. at 3. FBJ thereafter invested more than three million dollars to restore, update and revoice the library. *See id.* Partnered with the world-famous dancer Mikhail Baryshnikov, FBJ employed well-known actors from around the world to revoice the films in multiple languages: English-language versions: Jessica Lange, Kathleen Turner, Bill Murray, Shirley MacLaine, Charlton Heston, Sarah Jessica Parker and Jim Belushi; French-language versions: Catherine Deneuve and Irene Jacob; Spanish-language versions: Julio Iglesias, Maria Conchita Alonso and Edward James Olmos. *See id.* ¶ 5. When the lease enterprise Soyuzmultfilm Studio was reorganized into SMS, the agreement between the lease enterprise and FBJ also passed to SMS.

Defendant Rigma America Corporation, doing business as St. Petersburg Publishing House, operates several stores in Brooklyn, a warehouse and major wholesale / distribution and duplication facilities for Russian-language entertainment products, including audio and videocassettes, CDs and DVDs. *See* Pls.' Mot. Dis. at 4. Defendant Joseph Berov is Rigma's sole officer, director and stockholder. *See*

Defs.' Mem. Opp. Pls.' Mots. for Partial Sum. J. and for Ord. of Contempt and Supp. Defs.' Cross–Mot. for Partial Sum. J. [hereinafter "Defs.' Cross–Mot."] at 5. Defendant Natasha Orlova, according to the defendants, is "a sometime employee of Rigma who has no ownership interest in the company." *Id.*

FBJ and Rigma concluded an agreement on July 20, 1998 to give defendants the rights to distribute certain films to which FBJ has the exclusive rights. *See* Pls. Mot. Dis. at 4. The agreement permitted distribution of a special edition of these titles only for retail purposes within the defendants' retail catalogue. *See id.*

Following what they perceived to be repeated violations of the agreement and of their copyrights in the films, FBJ instituted this present action. A preliminary injunction in plaintiffs' favor was entered on defendants' consent on May 4, 1999. As has been detailed above, defendants have admitted to violating the injunction, and the sole issue now before the court is whether or not FBJ is the legitimate copyright holder in the films sold by the defendants.

### Discussion

(1)

■ Plaintiffs first contend that FSUESMS has no standing to bring suit in this court because its registration has been cancelled, and therefore, it does not legally exist in Russia. *See* Pl.'s Mot. Dis. at 7. As plaintiffs have indicated, to make a determination about whether a foreign corporation has standing to sue, the courts must look to the law of the country where the corporation is or claims to be incorporated:

---

**20.** All parties expressly agreed during oral argument that they did not wish to await further Russian court decisions before proceeding to decision on the motion before this court. *See* Oral Arg. at 65–67.

A corporation organized and existing under the laws of a foreign state which we have recognized and with which we have comity may ordinarily seek the aid of our courts in assertion of its rights, even against our own citizens. If the existence of the corporation, its capacity to sue, or the authority of its directors to represent it or to bring the action is challenged, we look to the charter and the law of its corporate domicile for the data upon which we can rest our determination of such questions.

*Russian Reinsurance Co. v. Stoddard,* 240 N.Y. 149, 147 N.E. 703 (Court of Appeals, New York, 1925). Also, Fed.R.Civ.P. 17(b) explicitly provides that "[t]he capacity of a corporation to sue or be sued shall be determined by the law under which it was organized."

Plaintiffs argue that because FSUESMS's registration was cancelled by the June 5, 2000 and July 24, 2000 Russian court decisions, FSUESMS is not a legal enterprise, cannot do business under Russian law, *see* Art. 135 of the Russian Arbitration Procedural Code, and therefore, does not have standing to sue in this court. *See* Pls.' Mot. Dis. at 8–9. Plaintiffs add that the August 18, 2000 decision by the Federal Arbitrazh Court for the District of Moscow that is relied on by FSUESMS did not overturn the June 5, 2000 and July 24, 2000 decisions but rather, addressed itself to the March 6, 2000 and June 7, 2000 lower court decisions in the suit brought by FSUESMS against SMS. *See*

*id.* at 9–10, 147 N.E. 703. The legitimacy of FSUESMS's registration was not litigated in those cases. *See id.*

Plaintiffs' memorandum in support of their motion to dismiss is dated September 22, 2000. On September 25, 2000, the Federal Arbitrazh Court for the District of Moscow issued a brief order vacating and remanding for reconsideration the June 5, 2000 and July 24, 2000 decisions relied upon by the plaintiffs that cancelled FSUESMS's registration. *See* Sept. 25 Dec. As of the date of this opinion, a decision on remand has upheld FSUESMS's registration, and that decision has been affirmed at two successive appellate levels.[21] Although there is one last appeal that may be taken, at the present time FSUESMS's registration has been held valid, and accordingly, it will be presumed that FSUESMS has the necessary standing to bring suit in this court until such time as a Russian court with authority to revoke FSUESMS's corporate registration should decide otherwise.[22]

### (2)

In order for Films by Jove to be able to pursue its claim against the defendants, FBJ must be the rightful owner of the copyrights in the relevant films.[23] FBJ claims its rights in the copyrights on the basis of the 1992 agreement between it and the lease enterprise Soyuzmultfilm Studio, which purported to make FBJ the exclusive worldwide licensee in the films produced by the state enterprise and lease enterprise Soyuzmultfilm Studio. The

---

**21.** These decisions, rendered, respectively, on January 25, 2001, April 3, 2001 and June 4, 2001, will be addressed in detail below.

**22.** It is noteworthy that plaintiffs do not pursue their standing argument in any subsequent submissions to the court.

**23.** Technically, FBJ has an argument that the defendants, having signed the injunction, and having violated it while it was still in effect,

are now barred from contesting the ownership of the underlying copyrights. If the defendants came to believe, at any given point during the pendency of the injunction, that the copyrights were not legitimately licensed to FBJ, the proper procedure would have been to move to vacate the injunction, not ignore it. Nonetheless, I will determine the issue on the merits.

first question that must be answered, then, in determining whether or not FBJ is currently entitled to maintain a suit for copyright infringement is whether or not the lease enterprise Soyuzmultfilm Studio was the rightful owner of the copyrights at the time when it licensed them to FBJ.

■ The issue of initial copyright ownership must be decided in accordance with Russian law. The Second Circuit has endorsed this view. *See Itar–Tass Russian News Agency v. Russian Kurier, Inc.,* 153 F.3d 82, 90 (2d Cir.1998) ("Since the works at issue were created by Russian nationals and first published in Russia, Russian law is the appropriate source of law to determine the issues of ownership of rights."). Many of the works at issue are "restored works," which are no longer in the public domain as a result of the Uruguay Rounds Agreements Act of 1995. *See* Pls.' Not. of Mot. to Dis. 3rd Party Compl. Purs. to FRCP 12(b)(6) at 6. 17 U.S.C. 104A(b) awards ownership of a restored work to "the author or initial rightholder of the work as determined by the law of the source country of the work." The source country, as defined by 17 U.S.C. 104A(h)(8) is Russia. In any case, therefore, Russian law applies, and all parties are in agreement on this. *See* FSUESMS's Cross–Mot. at 5.

■ No similar agreement exists, however, on the question of what Russian law has to say about the paradigm this case involves. Each side presents experts in Soviet and Russian copyright law to support its position. It should be noted, in this connection, that "[d]etermination of a foreign country's law is an issue of law." *Itar–Tass,* 153 F.3d at 92; *see* Fed. R.Civ.P. 44.1; *Bassis v. Universal Line, S.A.,* 436 F.2d 64, 68 (2d Cir.1970). Therefore, disagreements among experts about Russian law do not stand in the way of a grant of summary judgment in favor of either party.

■ Both parties agree that in Russian copyright law, as in its American counterpart, "[o]nly the successor to the primary rights of the author may further transfer the rights. There must be a continuous chain of transfers starting with the Film Studios. Otherwise a party conducting the transfer does not have the authorship rights and cannot transfer such right to anybody else." Decl. of Professor V.A. Dozortsev ¶ 1, Ex. 10, attached to Decl. of Julian Lowenfeld. Accordingly, Plaintiffs' principal experts, Professor Paul B. Stephan, who is Percy Brown, Jr. Professor of Law and the E. James Kelly, Jr. Class of 1965 Research Professor at the University of Virginia School of Law and Professor Michael Newcity, who is Deputy Director of the Center for Slavic, Eurasian, and East European Studies at Duke University begin by arguing that the copyrights belonged, as an initial matter, to the state enterprise Soyuzmultfilm Studio. The suggestion is that if the copyrights were owned by the state enterprise Soyuzmultfilm Studio, they could have been legitimately transferred to the lease enterprise Soyuzmultfilm Studio, whereupon the lease enterprise could have concluded an equally legitimate agreement with FBJ. If, on the other hand, as FSUESMS's expert, Prof. Maggs, argues, the copyrights were never owned by the state enterprise Soyuzmultfilm Studio, they could never have been legitimately transferred to the lease enterprise Soyuzmultfilm Studio, which, therefore, could not make them the subject of an agreement with FBJ. We will see in due course whether or not this starkly polarized way of putting the question holds up under scrutiny.

Professor Newcity first notes that the films at issue in this case were initially published between the years 1946 and

1995,[24] the majority between 1964 and 1990. *See* Newcity Decl. of January 23, 2001 [hereinafter "First Newcity Decl."] ¶ 21. For most of this period, the copyright law in effect was either the U.S.S.R. Fundamentals of Copyright Law adopted by the Russian Soviet Federative Socialist Republic ("R.S.F.S.R.") in October, 1928 or the R.S.F.S.R. Civil Code which superseded the 1928 law in 1964. *See id.* It is not disputed that the 1964 law and the 1928 law were, in all relevant respects, identical. *See id.* ¶ 22. The 1964 law was itself expressly superseded by the Russian Law on Copyright and Neighboring Rights in 1993. *See id.* ¶ 21.

Article 3 of the Decree of the All–Union Central Executive Committee of the R.S.F.S.R., dated October 8, 1928, "On Copyright," provided that copyright in a film was granted to the film studio that published it. *Id.* ¶ 24.[25] Article 486 of the 1964 Civil Code, entitled "Copyright in Motion Pictures, Television Films, Radio and Television Transmissions," provided that

> Copyright in a motion picture or a television film is owned by the enterprise which made the film.
> Copyright in an amateur motion picture [or] television film is owned by its authors or coauthors.
> The author of the script, the composer, director, chief cameraman, artistic director, and the authors of other works which constitute a component part of a motion picture or a television film own the copyright in each of their works. Copyright in a radio or television transmission is owned by the radio or television organization transmitting it, and the copyrights in the works included in that transmission are owned by their authors.

*Id.* ¶ 23. Thus, it would appear that the copyrights in all films during the period of the state enterprise Soyuzmultfilm's active existence, 1936–1989, would have belonged to that same enterprise.

However, FSUESMS's principal expert, Peter B. Maggs, Peer and Sarah Pedersen Professor of Law at the University of Illinois College of Law, contends that this interpretation of Article 486 is inaccurate. *See* Maggs Decl. ¶ 18. According to him, the above translation of that article erroneously uses the terminology "is owned by," whereas "[c]opyright in a cinematic film or a television film *belongs to* the enterprise which has effectuated the filming" would have been the more appropriate translation. *Id.* (emphasis added by Professor Maggs). The Russian verb that gave rise to this dispute, transcribed into the Latin alphabet, is "prinadlezhat," which, according to both Professor Maggs and Professor Newcity, can be translated as either "to belong to" or "to own." *See* Maggs Decl. ¶ 18; First Newcity Decl. ¶ 27. Professor Newcity provides entries from two dictionaries which suggest that "prinadlezhat" can be translated in either fashion. *See* Ex. 1, attached to First Newcity Decl. But, despite this ambiguity, Professor Maggs insists that "belongs to" is the proper translation in the current context.

What hinges on this distinction, at least according to Professor Maggs, is the question of who actually owns the copyrights, the state enterprise or the state itself. The state, Professor Maggs argues, was

---

24. The dates are actually 1946 to 1991. *See* Pls.' Not. of Mot. and Mot. to Dis. at 8.

25. Where Russian law is quoted from or described, citations will often be to the declaration of an expert rather than to the law itself due to the variability of the translations that appear throughout the evidentiary exhibits submitted to the court.

the actual owner of the pre 1989 copyrights. *See* Maggs Decl. ¶ 18. State enterprises such as Soyuzmultfilm Studio did not own property but rather, held the property of the Soviet state in "operative management," which means, simply, that the state enterprise was responsible for managing property owned by the state. *See id.*

In support of this interpretation of the law, Professor Maggs offers two pieces of evidence, Article 94 of the 1964 Russian Civil Code and an excerpt from a text, *Soviet Law* (London: Butterworths, 1983), by Professor William Butler, an expert on Soviet law. The former reads:

> The state is the sole owner of all state property
>
> State property assigned to state organizations is in the operative management of these organizations exercised within the limits established by law, which exercise—in accordance with the purposes of their activity, planned tasks, and the purpose of the property—the rights of possession, use, and disposition of the property.

*Id.* ¶ 18. The latter states:

> The State is regarded as the sole owner of all state property In those instances when the State allocates a portion of its property to State organisations it does not relinquish ownership but places the property in the 'operative management' of that organization whose right of possession, use, and disposition must be exercised in accordance with law, the charter of the organization, and the purpose of the property.

*Id.* ¶ 19.

Plaintiffs contest Professor Maggs' reading of Article 486 as well as the significance of both pieces of evidence. Professor Newcity first notes that the relevant paragraph from Article 486 applies both to state and to non-state enterprises, and, as Professor Maggs concedes, non-state enterprises have full ownership of their copyrights. *See* First Newcity Decl. ¶ 28; Maggs Decl. ¶ 18 ("In particular, under Article 486, if a non-state enterprise, for instance a cooperative, made a motion picture, it would become the owner of the intellectual property rights in the picture, while if a state enterprise made a motion picture it would have the right of operative management of the intellectual property rights in the picture."). Why, to frame Professor Newcity's argument sharply, would the drafters of the copyright statute allow the ambiguous word "prinadlezhat" to designate two very different levels of ownership or control depending on whether the enterprise of relevance is a state or non-state enterprise without making that distinction apparent? Furthermore, the word "prenadlezhat" is used throughout the rest of Article 486 to refer to copyright ownership on the part of individuals, as opposed to enterprises, and there is no dispute that the word would certainly denote true ownership in these contexts. *See* Newcity Decl. ¶ 29. Why, once again, use the same ambiguous word in consecutive paragraphs from within a single provision of a code to denote two very different levels of ownership / control without taking care to note any such differentiation with particularity?

Furthermore, Professor Newcity notes, Professor Maggs has cited no scholarly or judicial authority in support of his interpretation. *See id.* ¶ 35. The sole authorities in his favor, Article 94 of the 1964 R.S.F.S.R. Civil Code and the above-cited excerpt from Professor Butler's book, are irrelevant because they refer to physical or material property, not intellectual property. *See id.* ¶ 36. Article 94, Professor Newcity points out, is taken from Part II of the R.S.F.S.R. Civil Code, which relates to the law of tangible property used by

state enterprises to produce goods and services. *See id.* In support of this view, Professor Newcity cites Article 95:

> *Article 95. Objects of the Right of State Ownership*
>
> State property extends to all land, its minerals, waters, forests, factories, mills, pits, mines, and electric power stations, to rail, water, air, and motor transport, banks, means of communication, agricultural, trading, communal, and other enterprises organised by the state, and also to the main housing resources in towns and urban settlements. The state may also own property of any other kind.
>
> The land, its minerals, waters, and forests, being the exclusive property of the state, may be granted out for use only.

*See id.* Copyright, Professor Newcity notes, is addressed by Part IV of the Civil Code. *See id.* Therefore, Article 94 is inapplicable to the case at bar. *See id.* Adducing Professor Maggs' own statement that "[u]nder normal Soviet civil law drafting style, the 'General Provisions' of a statute apply also to the more specific narrower types of transactions covered by the statute, unless clearly negated," Maggs Decl. ¶ 38, Professor Newcity observes that the "General Provisions" of the Civil Code are to be found in Part I, which is then followed by seven parts each addressing a discrete area of the law, of which Part II, "The Law of Property" and Part VI, "Copyright Law" are examples. *See* First Newcity Decl. ¶ 37; Ex. 3, attached to First Newcity Decl. This, offers Newcity, is an additional reason why these two parts of the code are not directly relevant to one another. *See* First Newcity Decl. ¶ 37.

Professor Newcity goes on to survey scholarly and judicial authority and finds all sources to support the view that the state enterprise responsible for producing a film owns the copyright to that film. Professor Newcity attests to having consulted more than a dozen scholarly books with not one dissenting voice. *See id.* ¶ 43. For example, copyright expert Eduard P. Gavrilov in his 1984 book *Soviet Copyright Law* has written:

> The cases in which an original copyright is owned by a legal entity are established by the legislation of the USSR and the civil codes of the union republics. All-union legislation does not provide for such cases, but the civil code secures, in the first place, to an organization that publishes a scientific collection, encyclopedic dictionary, journal, and other periodic publications, the copyright to that publication as a whole; and in the second place, to an enterprise that shoots a motion picture or television film, and to radio and television organization that transmit radio and television broadcasts, the copyright to the specified works.

*See id.* ¶ 43. Gavrilov's view is seconded by S.A. Chernysheva in her 1984 book *Legal Regulation of Copyright Relations in Cinematography and Television,* as well as by Irina Savel'eva in her 1986 text *Legal Regulation of Relations in the Field of Artisitic Creation.*[26] *See id.* ¶ 44.

Those who have surveyed the 1928 law reach similar conclusions. Among these experts are B.S. Antimonv and E.A. Fleishits who, in their 1957 book, *Copyright Law,* speaking of the 1928 legislation, conclude that "[the law] recognized ... film studios that create films as subjects of copyright." *See id.* ¶ 42. V.I. Serebrovskiy echoes this conclusion in his 1956 book *Problems of Soviet Copyright Law,*

---

**26.** These texts, it might be noted, were written before the beginning of the Perestroika period and are, therefore, uninfluenced by the copyright reforms of that era.

as does Serge L. Levitsky in his 1964 book *Introduction to Soviet Copyright Law. See id.*

Further, Professor Gavrilov has submitted a declaration in this case in which he concludes, in accordance with his view conveyed above, that "the unlimited exclusive copyright, including the right to show the films, was vested in film studio 'Soyuzmultfilm' ... for all the films under consideration." Decl. of Eduard P. Gavrilov, Ex. 4, attached to Decl. of Julian Lowenfeld. In addition to Gavrilov, another leading authority on Russian copyright law, Professor Viktor A. Dozortsev has written that "the Studio which filmed the picture is the sole proprietor of the copyright ... that has ... the right to use the work and the entire right to dispose of the work." Decl. of V.A. Dozortsev, Ex. 10, attached to Decl. of Julian Lowenfeld. Svetlana Rozina, another expert on Russian copyright law, has also submitted a declaration in agreement with this conclusion. *See* Decl. of Svetlana Rozina, Ex. 11, attached to Decl. of Julian Lowenfeld.

Judicial decision, although not entitled to the same weight as similar decisions in common law regimes, as Professor Newcity cautions, have reached identical determinations. Professor Newcity makes mention of the *Matveevna v. Krupniy Plan* case, in which the court held that "[a]ccording to the Civil Code (Article 486, CC of RSFSR) ... all the proprietary rights belonged to the film studio, which produced the film," Ex. 8, attached to Decl. of Julian Lowenfeld, and the *Sergeyev* case, where the court held that "[a]c-

cording to the Article 486 of CC of the Russian Soviet Socialist Federation of 1964, which was in effect during the creation of the films—the author's right for the film belonged to the organization which shot the films ..., i.e., film studios." Ex. 9, attached to Decl. of Julian Lowenfeld. The December 26, 2000 remand decision of the Moscow Region Arbitrazh Court in the suit between SMS and FSUESMS, quoted at length above, also held that the copyrights produced by the state enterprise Soyuzmultfilm Studio belonged to that state enterprise as per the operations of Article 486.[27]

Additional evidence cited by Professor Newcity in support of his argument includes the fact that after 1978, at which time Goskino instituted the requirement that copyright notices be placed on films, the state enterprise Soyuzmultfilm was listed as the copyright proprietor. *See* First Newcity Decl. ¶ 47. Further, Professor Newcity cites specific circumstances under which the state could become a copyright holder. *See id.* ¶ 48. These circumstances are limited to: (1) the case where the state uses its right, available both under the 1928 and 1964 law, to purchase compulsorily an author's copyright; (2) the case where a copyright proprietor specifically designated the state as a successor to the copyright in his or her will; (3) the case where an enterprise owning a copyright is liquidated and the copyright escheats to the state; and finally, (4) the case where the term of copyright on a given work had expired, whereupon the R.S.F.S.R. Council of Ministers could pro-

---

27. While it might appear that the December 26, 2000 decision has been mooted by the April 20, 2001 ruling of the Federal Arbitrazh Court for the District of Moscow, which reversed the December 26, 2000 decision, the April ruling actually says absolutely nothing about Article 486 or why that article would be inapplicable to this case. Moreover, and even more importantly, it does not at any point say that the copyrights themselves belonged to the state rather than the state enterprise. The decision will be discussed more extensively in the section of this opinion addressing the issue of copyright transfer from the state enterprise to the lease enterprise.

claim it to be state property. *See id.* None of these circumstances obtain here, Professor Newcity notes, and therefore, the copyrights in this case could not have belonged to the state. *See id.* ¶ 49. Article 498 of the 1964 R.S.F.S.R. Civil Code, which provides that "[a] copyright of an organization is valid permanently. In case of the reorganization of the organization which owns it, the copyright is transferred to its successor in title, and in case of its liquidation, to the state," *Id.* ¶ 55, is, according to Professor Newcity, particularly compelling evidence that the copyrights belonged to the state enterprise *ab initio,* since otherwise there would be no need to include such a provision in the Code, or alternatively, the provision would only apply to non-state enterprises, which its broad language does not indicate. *See id.* ¶ 51.

Finally, Professor Newcity points to legislative action by Russia's current government that implicitly recognized that state enterprises such as Soyuzmultfilm Studio were indeed copyright holders. *See id.* ¶ 52. Plaintiffs' other principal expert, Professor Stephan, elaborates on the nature of this action in detail. In 1998–99, the Russian Duma contemplated a bill that would have, if enacted, asserted government ownership of all copyrights in audio-visual works created before August 2, 1992, aside from those held by individuals, as opposed to organizations. *See* Decl. of Paul Stephan of January 22, 2001 [hereinafter "Second Stephan Decl."] ¶ 16. A November 11, 1998 letter from the Russian Federation State Committee on Cinematography ("Roskino") argued against the adoption of the proposal, observing that "for films made before August 3, 1992, there exist two kinds of rights: first the state rights, expressed through keeping all the initial stock of films in state archival facilities, and second, exclusive property rights to films (objects of copyrights),

which belong to the film studios." *Id.* ¶ 16. The letter further argued that the ends of the proposed legislation could only be properly achieved by "a transfer of copyright on a contractual basis, an obligatory condition of which would be the payment of copyright compensation." *Id.* The Russian government followed suit, submitting an official response opposing the law to the legislature on April 12, 1999, arguing that copyrighted works created before the enactment of the 1993 Russian Copyright Law had the protection of Russian law and could not be expropriated by the proposed measure, which would have applied to "juridical persons, including those that had been transformed at that time [from state enterprises] into shareholding companies and other organizations." *Id.* A similar conclusion was reached by the Duma's Committee for Cultural Affairs, which concluded that the proposal "in form directed toward taking away the proprietary rights to audio-visual creative work of juridical persons (movie and TV studios), would amount to an expropriation of intellectual property from their legal rightful owners." *Id.* Persuaded by such opinions, the Duma rejected the bill. *See id.*

Professor Stephan also presents some very illuminating background information on the Soviet copyright situation that is helpful in distinguishing the rights of the state enterprise from the rights of the state. According to him, Professor Maggs' use of the term "operative management" to describe the rights of state enterprises vis-à-vis the works that they had created obscures the debate extending from the 1950s to the 1980s among Soviet legal scholars about what precisely the rights of such enterprises were and should be. *See id.* ¶ 2. As a threshold matter, there was no dispute that the copyright itself, the underlying right, was held by the state enterprise. *See id.* ¶ 3. The dispute cen-

tered more on the question of what precisely that copyright entailed, i.e., to what extent the state could restrict and control the economic uses of the state enterprise's copyrights. *See id.*

Two schools of thought evolved. *See id.* ¶ 2. The advocates of the "economic law" approach suggested that "all organs of the Soviet government held whatever they possessed or controlled at the sufferance of the Soviet state and acted only as agents of the state." *Id.* By contrast, the "civil law" advocates "conceded that the state had ultimate sovereignty over all state property, but maintained that the assignment of ownership rights to state entities was legally meaningful and would be supported by the normal rules of civil law absent some specific enactment of the state to the contrary." *Id.* "The economic law school maintained that the state enterprise had essentially no rights, and that the default owner of state property was some higher level of the state bureaucracy. The civil law school argued that state enterprises had property and contract rights, subject to specific and valid orders from the state bureaucracy limiting those rights." *Id.*

In practice, although Article 486 of the Civil Code of the R.S.F.S.R. awarded copyrights to their authors and to state enterprises if they were the originators of the copyrighted works, the exploitation of those copyrights was restricted by the state. *See id.* ¶ 3. For example, the right to foreign exploitation of a film was denied to copyright holders by the State Monopoly on Foreign Trade from the early days of the U.S.S.R. A December 29, 1973 decree of the U.S.S.R. Council of Ministers adopted a "Regulation on the State Committee of the Council of Ministers of the U.S.S.R. on Cinematography" "confirmed Goskino's monopoly rights to distribute films produced by Soviet film studios within the Soviet Union (Article 63) and to market films abroad through the auspices of the All Union Association [Soveksportfilm] (Article 60)." *Id.*

Professor Stephan summarizes this state of affairs as follows: "Thus an act of Soviet administrative law limited the ability of the enterprises that held copyrights in films of a range of powers to exploit these rights commercially. But the underlying right, as opposed to the power to exploit commercially, remained with the enterprise, and with perestroyka the commercial power was regained."[28] *Id.* But, after all,

---

**28.** The commercial power was regained through a series of acts that Professor Stephan delineates:

Soviet film studios obtained the right to market their film copyrights abroad as a result of several normative acts. In a response to an earlier determination by the Central Committee of the Communist Part of the Soviet Union, Decree 1526 of the U.S.S.R. Council of Ministers, issued December 22, 1986, gave many state enterprises the right to enter directly into contracts with foreign customers. *Sobranie Postanovleniy pravitel'stva SSSR*, No. 6, Item 24 (1987). Pursuant to this regulation, Goskino on March 14, 1988, issued Order 38, which divested Soveksportfilm of its monopoly over exports. On March 7, 1989, Decree 203 of the U.S.S.R. Council of

Ministers announced a new list of state supervisory bodies that held the right to control the export and import activity of their particular industry. The appendix to this decree indicates that Goskino retained power over the import of foreign films, but had no rights with respect to the export of films belonging to Soviet studios. *Sobranie Postanovleniy pravitel'stva SSSR*, No. 16, Item 50 (1989). Accordingly, [the state enterprise Soyuzmultfilm Studio] on September 19, 1989, received a license from the U.S.S.R. Ministry of Foreign Economic Relations to exploit its film library through contracts with foreign parties. In other words, as a result of perestroyka the Soviet government recognized that the right to receive hard currency revenues from a film belonged to the enterprise, and not to the

what does it mean to "own" a copyright other than to have some ability to exploit it? Or, to employ the dominant law school property metaphor, if the proverbial "bundle of sticks" commonly associated with the right of possession to an intangible item belongs to someone other than the "rightful holder" of that item, can it truly be said that the rightful holder retains anything at all, and is it not precisely this issue—the question of who owned what sticks in the bundle—that constituted the essence of the dispute between the civil law and economic law advocates? Accordingly, taking Professor's Stephan's position as accurate, it could be concluded that the

state, and authorized film studios generally, and [the state enterprise Soyuzmultfilm Studio] in particular, to exploit this right.

The 1987 Law on the State Enterprise (Association) further strengthened the rights of state enterprises vis-à-vis their supervising bureaucracy. It made clear that state enterprises could have economic rights against the state, which the law protected. Central to this statute was specification of an enterprise's own income that, according to Article 3(1), "is at the enterprise's disposal, it is used independently, and it is not subject to withdrawal." Article 9(3) of the Law in turn limited the rights of higher-level agencies over the enterprise and gave enterprises the right to appeal orders from those agencies to arbitration courts. It states that:

The Ministry, department or other higher-level agency may transmit instructions to the enterprise only in accordance with its jurisdiction as established by legislation. If a ministry, department or other higher-level agency issues an act not in accordance with its jurisdiction or that violates legislative requirements, the enterprise has the right to appeal to a state court of arbitration to have the act in question declared invalid, in full or in part.

Article 19(4) recognized the rights of enterprises to engage in foreign transactions:

The right to carry out directly export-import operations (including markets in capitalist and developing countries) and to create an economic-accountability foreign trade form for this purpose may be granted to an enterprise that provides substantial deliveries of output (works, services) for export.

Article 19(6) allowed state enterprises to establish foreign currency payment accounts, which belonged to the enterprise and were protected from claims by higher organs: "Money in the enterprise's foreign-currency payments fund is not subject to withdrawal and may accumulate for use in subsequent years."

This legislation set the stage for the 1989 Fundamental Principles on Leasing (Fundamentals). The Fundamentals did more than authorize the transfer of state property to lease enterprises (lessees) for a limited term. Its principal purpose was to encourage the transformation of state enterprises into privately owned lease enterprises. In a 1988 speech to the Central Committee of the Communist Party of the Soviet Union, General Secretary Gorbachev spoke of the need to extend leasing relations to "all branches of the national economy," explaining that these relations "ensure the real economic independence and responsibility of workers and labor collectives, as well as a direct connection between people's earnings and the final results of their work." Kommunist, No. 12, p. 23–24 (1988), translated in Soviet Statutes and Decisions at 12–13 (Fall 1990). There ensued what U.S.S.R. Prime Minister Ryzhkov described as a "massive conversion to leasing." Pravda, October 3, 1989, p. 4, translated in Soviet Statutes and Decisions at 13 (Fall 1990). As was true of all the perestroyka legislation intended to expand the sphere of private economic activity, the state would receive compensation not only directly (i.e., rent), but, at least as importantly, through taxes paid on the lease enterprise's income. *See* Paul B. Stephan, "Perestroyka and Property: The Law of Ownership in the Post–Socialist Soviet Union," 39 Am. J. Comp. L. 35, 49 (1991).

To effectuate the policy of encouraging direct economic incentives for producers, the Fundamentals permitted a complete transformation of a state enterprise into a lease enterprise, resulting in the disappearance of the state enterprise and the emergence of the privately owned lease enterprise as its legal successor.

*Id.* at ¶¶ 4–7.

issue of the true "ownership" of Soviet-era copyrights, or at least ownership as American copyright law would define it, could not be fully resolved until after the collapse of the Soviet Union and the subsequent Perestroika period reforms had made a choice, one way or the other, either to valorize, or alternatively, to devalue the incipient right granted to the state enterprise. Thus, the inquiry of whether or not the copyrights were owned by the state or by the state enterprise, requiring no definitive resolution during the Soviet era, would be collapsed into an inquiry of how Perestroika-era legislators elected to treat these rights. There will be occasion to return to these questions later, when the legitimacy of the copyright transfer between the state enterprise Soyuzmultfilm and the lease enterprise Soyuzmultfilm is discussed.

Professor Maggs disputes many of the various arguments suggested by Professor Newcity and Professor Stephan. He begins by noting that even if Professor Newcity were correct that the state enterprise Soyuzmultfilm had full ownership of as opposed to operative management over the copyrights, this would not help plaintiffs, since there is no documentary evidence that any copyrights were ever transferred from the state enterprise to the lease enterprise in 1989. *See* Reply Decl. of Peter B. Maggs [hereinafter "Maggs Reply Decl."], attached to Reply Decl. of Robert W. Clarida [hereinafter "Clarida Reply Decl."] ¶ 15. Moreover, if the state enterprise had truly been liquidated in 1989 when the lease enterprise came into being, its copyrights would have escheated to the state pursuant to Article 498 of the Civil Code, which, as Professor Newcity noted, provides for such an outcome in the

event of an enterprise's liquidation. *See id.*

Professor Maggs proceeds to insist, however, that the copyrights were, in fact, owned by the Soviet state. He suggests that Professor Newcity has misinterpreted his linguistic argument by attributing to Professor Maggs the position that the word "prinadlezhat" in Article 486 means something less than full ownership. *See id.* ¶ 20. Professor Maggs corrects this misconception:

> My position was very simple. My position was not that the language of Article 486 indicated that the State Enterprise *owned or did not own the copyright.* My position was that since the word 'prinadlezhit'[29]—'belongs to' in Article 486 could cover either ownership or operative management, it is necessary to look to other sources, both to accepted Soviet legal theory of property rights and to the specific language of the directly relevant Article 94 of the Civil Code to determine what is meant by the word in a particular context.

*See id.*

Article 94, which, the reader will remember, set forth the notion of operative management, was, according to Professor Newcity, only pertinent to forms of property other than intellectual property. Professor Maggs disagrees. First, he notes that Article 95, the basis for Professor Newcity's argument, explicitly states that "[t]he state may also own property of any other kind." *See id.* ¶ 21. Next, he takes issue with Professor Newcity's suggestion that Article 94 and the other provisions of Part Two of the Civil Code that detail the law of property do not apply to the Civil Code as a whole. "In fact, 'Part One.

---

**29.** "Prinadlezhat" and "prinadlezhit" are forms of the same verb. The former is a plural form, the latter a singular.

General Principles,' 'Part Two. Law of Property,' and 'Part Three (I.) General Principles of Obligations' apply throughout the Code." *See id.* ¶ 22. Professor Maggs adduces, as evidence, a 1970 commentary on the Code by E.A. Fleishits & O.S. Ioffe, where citations to the applicability of provisions from Part Two and Part Three (I) appear throughout after individual code sections. *See id.* In particular, Articles 94 and 95 are cited in a commentary to Article 237 "Contract of Purchase and Sale." *See id.* ¶ 23. Another authoritative 1982 commentary edited by S.N. Bratus and O.N. Sadikov also cites the applicability of Articles 94 and 95 to Article 237. These citations, according to Professor Maggs, belie Professor Newcity's argument that Article 94 does not apply to other sections of the Civil Code. *See id.*

Professor Maggs goes on to attempt to cast doubt upon the import of Newcity's impressive catalogue of expert opinion in support of the point that the copyrights were owned by the state enterprise Soyuzmultfilm Studio as opposed to the state. Every one of these experts, Professor Maggs says, use ambiguous terms such as "holder" and "belongs to" rather than the Russian word "sobstevnnik" that, according to Professor Maggs, "unambiguously denote[s] ownership." *Id.* ¶ 24. To the extent that Professor Newcity has used the word "own" or "ownership" in his translations, he has skirted the issue. *See id.* ¶ 25.

It is not entirely clear how Professor Maggs' distinction between "belongs to" and "is/are owned by," both of which can, after all, mean the same thing, refutes the above-quoted opinion of Professor Gavrilov, when Gavrilov says that "the unlimited exclusive copyright, including the right to show the films, was vested in film studio 'Soyuzmultfilm'... for all the films under consideration." Decl. of Eduard P. Gavri-

lov, Ex. 4, attached to Decl. of Julian Lowenfeld, or the opinion of Professor Dozortsev, where he says that "the Studio which filmed the picture is the sole proprietor of the copyright ... that has ... the right to use the work and the entire right to dispose of the work." Decl. of V.A. Dozortsev, Ex. 10, attached to Decl. of Julian Lowenfeld. The word "prenadlezhat" does not appear in these quotations, and Professor Maggs does not meaningfully address their substance. What, after all, does Professor Gavrilov mean other than copyright ownership when he talks about "the unlimited exclusive copyright" being "vested in" Soyuzmultfilm Studio? What does Professor Dozortsev mean other than copyright ownership when he claims that the studio is the "sole proprietor of the copyright" and has the "right to use" and "entire right to dispose" of the work? Professor Maggs offers no response to such questions.

He does, however, parry Professor Newcity's point about the placement of copyright notices on films, calling it inconsequential, since "[r]egistration did not establish ownership; it merely allowed central authorities, who were providing the funds for making films and were censoring films, to keep track of which studios made which films." *Id.* ¶ 26.

As for the proposed copyright legislation mulled over and ultimately rejected by the Duma, Professor Maggs objects to the discussion as being irrelevant, "because Russian courts have never treated the history of legislation that was not passed nor comments on such legislation as of any legal significance whatsoever." *See id.* ¶ 30. His claim here is surely a bit overstated, since, although rejected legislation may not be binding legal authority, it can certainly be useful as an indication of what authoritative voices understand the current state of the law to be. If a

legislature would have to pass a new law in order to put copyrights in the hands of the state, then it stands to reason that without that law, those copyrights are owned by someone or something other than the state. The series of letters opposing the measure by Roskino, the Russian government and the Duma's Committee for Cultural Affairs, all of which label the proposed legislation an exercise in expropriation of intellectual property, gives credence to precisely this notion.

Perhaps sensing that his dismissal of this legislative action as irrelevant does not quite suffice to dispel its import, Professor Maggs' proceeds to make the following argument:

> None of the material [Professor Stephan] discusses refers specifically to Soyuzmultfilm. One of the letters does refer to Mosfilm, the largest of the Russian film studios. As we know from *Mosfilm v. Committee of the Russian Federation for Cinematography, et al.* (Exhibit 10 to the Declaration of Julian Lowenfeld), a Russian court, after examining the relevant documents, held the privatization process for Mosfilm properly transferred copyrights to the successor private company. Obviously with respect to Mosfilm and other privatized studios that did own copyrights, the writers of the comments quite properly viewed the proposed law as involving expropriation. But we know from the Information Letter of the High Arbitration Court that film studios created by a reorganization whose reorganization papers did not provide for transfer of copyrights had no copyright rights at all to prior repertory. And certainly those film studios like the lessee enterprise, that merely leased equipment and build-

ings, obtained no copyrights. Thus it would be totally improper in any event to apply the conclusions in these comments to the copyright rights of film studios not mentioned in the letter.

*Id.* ¶ 30. This argument is somewhat less than analytically bulletproof. First of all, Professor Maggs has elsewhere in his reply declaration discussed the December 26, 2000 remand decision of the Moscow Region Arbitrazh Court which concluded that the privatization process for Soyuzmultfilm Studio, like the Mosfilm privatization process that Professor Maggs refers to, succeeded in transferring the copyrights of the state enterprise to the lease enterprise (and later to the joint stock company plaintiff).[30] *See id.* ¶ 11. The Information Letter of the High Arbitration Court (appearing as Exhibit 1 attached to the Maggs Reply Declaration) on which Professor Maggs seems to place great reliance here and elsewhere, is a document of little relevance to the case at bar, as will be explained shortly.

Professor Maggs also provides no reason to exclude Soyuzmultfilm Studio from the rather broad language of the letters adduced by Professor Stephan. The Duma's October 15, 1999 "Official Response" to the proposed legislation, for example, states that the "[p]roposed bill is directed toward taking away proprietary rights of juridical persons (movies and TV studios) to audio-visual creative works and that would mean expropriation of intellectual property from their legal rightful owners." Duma's Official Response, Ex. 11, attached to Second Stephan Decl. ¶ 1. The state enterprise, it will be recalled, "is a juristic person, it enjoys the rights and performs the duties connected with its activity, and it possesses a specific part of

---

**30.** Admittedly, Professor Maggs denies that this part of the remand opinion is central to the holding. His argument, however, is, as there will be ample occasion to argue later, unsupported and untenable.

public property and has its own balance sheet." The Legislation of Perestroika, Ex. 2, attached to Second Stephan Decl. at 21. In addition, Article 486 of the 1964 Civil Code of the R.S.F.S.R., the article that awards copyrights in motion pictures to the enterprises which shot them, is specifically cited in the Duma's letter. Duma's Official Response, Ex. 11, attached to Second Stephan Decl. ¶ 1. Thus, it is quite clear that the language of the Duma's Official Response is broad enough to have applied to Soyuzmultfilm Studio.

In response to Professor Stephan's distinctions between the "civil law" theorists and the "economic law" theorists, Professor Maggs advances the claim that during the pre-Perestroika period, even the most ardent representatives of the civil law school, such as Professor O.S. Ioffe, emphasized the fact that there was a "single fund" of state property and that enterprises owned no property:

> State socialist ownership constitutes national property. It is characterized therefore *by the principle of a single fund.* The content of this principle is that state property, regardless of in whose possession it is located belongs by right of ownership only to the state. Individual state agencies—state enterprises and institutions—possess specified systems of state property necessary for the performance of the tasks placed upon them. However the state agencies are not the owners of the state property transferred to them. The Soviet state acts as the single and sole owner.
>
> .    .    .    .    .
>
> State agencies possess, use, and dispose of the property in their possession not by their authority but by the authority granted to them by the state as owner.

*Id.* ¶ 16. Professor Maggs points out that the unambiguous word "sobstvennik" (owner) is used here. *See id.*

Professor Newcity and Professor Stephan respond to Professor Maggs' arguments. Newcity's first point is that he has not misread Professor Maggs' argument with respect to the use of the word "prinadlezhat."

> In his Declaration Professor Mags asserts that there is a dichotomy in Soviet copyright law. Non-state enterprises and individuals enjoyed ownership of their copyrights; state enterprises had only the right of operative management. The thrust of the analysis in my Declaration was that no such dichotomy existed. The Russian word that Professor Mags seizes on as the basis for his argument—prinadlezhat—is used throughout Soviet and Russian copyright legislation to refer to the rights of individuals, non-state enterprises, and state enterprises. No ambiguity existed in the copyright legislation; state enterprises owned the copyright in their films to the same extent as non-state enterprises and individuals. The ambiguity that Professor Maggs seeks to create by introducing principles of law relevant to other forms of property simply is fallacious.

Newcity Reply Decl. ¶ 6., attached to Decl. of Julian Lowenfeld of Feb. 20, 2001 (citations omitted). The "prinadlezhat" language was used throughout legislation and commentaries by Soviet and Russian scholars in referring to state enterprises, non-state enterprises and individuals. *See id.* ¶ 8. No distinction was made among these categories. *See id.* Yet, Professor Maggs insists that this same language denoted a different possessory interest for state enterprises than for non-state enterprises and individuals. *See id.* Professor Newcity's argument is that, without some basis for this distinction, Professor Maggs' view cannot be maintained. *See id.*

Professor Newcity likewise disputes Professor Maggs' interpretation of Article 94 and its applicability to non-material assets. *See id.* ¶ 7. While conceding that parts of the Civil Code may be cited by scholars to help interpret provisions from other parts of the Civil Code, Professor Newcity notes that it is a far cry from that proposition to Professor Maggs' suggestion that the provisions of Part II, which are clearly intended to govern tangible assets, will supersede the provisions of Part IV, which deal with intangible assets, absent some clear, express statement in the Civil Code that effects such a result. *See id.*

Finally, Professor Newcity responds to Professor Maggs' claim that even if the state enterprise had originally owned the copyrights, its copyrights would have automatically escheated to the state as per the operations of Article 498 of the R.S.F.S.R. Civil Code upon the liquidation of the state enterprise by pointing out that the enterprise was not liquidated, but rather, was transformed into the lease enterprise, an event that would have triggered a different paragraph of Article 498 and resulted in the passing of the copyright from the state enterprise to the lease enterprise. *See id.* ¶ 16. This point will be developed more fully later as part of the discussion of the transfer of the copyright from the state enterprise to the lease enterprise.

Professor Stephan disputes Professor Maggs' application of the "single fund" concept. "Soviet law," he writes, "gave great significance to the distinction between material and immaterial property. The former were characterized by the principle of the single fund, as the reference to Professor Ioffe's 1967 treatise indicates. Immaterial rights, and in particular intellectual property, stood on a different basis, as the language of the R.S.F.S .R. Civil Code clearly indicates." Stephan Re-

ply Decl. ¶ 5, attached to Decl. of Julian Lowenfeld of Feb. 20, 2001. Professor Stephan goes on to note that Professor Ioffe himself recognized this distinction when, in the same treatise quoted by Professor Maggs, in speaking of state enterprises among other institutions, he wrote: "If the legal entity is the *original owner* of the copyright, its copyright is transferred: 1) in the case of reorganization—to its legal successors, and 2) in the case of liquidation—to the state." *Id.* (emphasis added).

In the final analysis, it appears that plaintiffs and their experts have the better of the argument on the issue of who owned the copyrights prior to 1989. The text of Article 486 of the 1964 Civil Code of the R.S.F.S.R. and the corresponding provision of the 1928 Code, which vest copyright ownership in a film in the enterprise that created the film, is too clear, and Professor Maggs has not provided sufficient justification to depart from the obvious reading of the statute. He has adequately explained away neither the litany of expert opinion provided by the plaintiffs' principal experts nor the import of the Duma's contemplated 1998–1999 legislative action. Nor has he adequately accounted for Article 498 of the 1964 Civil Code and other provisions of the Code which expressly enumerate the circumstances under which the state could have possibly obtained ownership of the copyrights.

At the very least, plaintiffs have established the following proposition: before 1989, the state enterprise Soyuzmultfilm was, in some sense, the owner the copyrights in the films it produced. The argument would then be over the extent to which it was understood, during the Soviet era, that the state was *also,* in some sense, the owner of the copyrights. It is quite clear, for example, that the state enterprise Soyuzmultfilm did not enjoy the

rights of foreign or even domestic distribution that a copyright owner in the United States would have had and that some of these rights were retained by the state and placed under the aegis of various state agencies, such as Goskino and Soveksportfilm. Nevertheless, the state enterprise Soyuzmultfilm was a legal entity with at least nominal ownership of the copyrights. Although Professor Maggs has made much of the distinction between "prinadlezhat" and "sobstvennik," it appears that the distinction in Russian is no less murky than the difference between "belongs to" and "is/are owned by," in English,[31] and it would be foolhardy to make any bold conclusions about the power of the state enterprise Soyuzmultfilm Studio to transfer film copyrights to the lease enterprise on the basis of the contrast between these words, particularly when other provisions of the law address the transfer issue more directly.

Thus, although plaintiffs are probably correct in saying that the copyrights in the films produced by the state enterprise Soyuzmultfilm Studio belonged, for most purposes, to the state enterprise, the issue of initial copyright ownership, at least as far as this case goes, must inevitably collapse into the question of whether or not the state enterprise had the power to alienate those copyrights, the power to transfer them to another organization such as the lease enterprise and, if not, whether those copyrights could have passed to the lease enterprise in some other fashion. We turn, then, to these questions.

### (3)

Plaintiffs' expert Professor Stephan delineates the history of the formation of the lease enterprise Soyuzmultfilm Studio and the transfer of copyrights to it from the state enterprise:

To understand the somewhat unusual attributes of a lease enterprise, one must locate the concept of a lease enterprise within the unfolding of the Perestroyka program of the Soviet leadership between 1986 and 1991. In the beginning, Communist doctrine and Soviet law were hostile to the concept of private ownership of property used for productive economic activity. Aside from a few economically necessary but ideologically inconvenient exceptions, such as the use of small patches of land by members of collective farms for personal profit, the regime treated private economic activity as an undesirable, indeed criminal act. Thus any entity engaged in for-profit conduct had to trace its ownership back either to the state or some other collective entity, without the possibility of private investment.

---

**31.** Adding to the confusion is the fact that "prinadlezhat" is a form of a verb, meaning, literally, "belong to," while "sobstvennik" is a noun meaning "owner." *See* KENNETH KATZNER, ENGLISH–RUSSIAN RUSSIAN–ENGLISH DICTIONARY 731, 805 (1984). There is no noun form of prinadlezhat—at least not one that means anything like "one to whom something belongs"—and no verb form of sobstvennik. *See id.* Therefore, the two words cannot be easily substituted for one another in a sentence without reorganizing the structure of the sentence as a whole. The use of one rather than the other in any particular sentence, therefore, may be occasionally dictated less by any fine denotative distinction than by the word's location and function in that sentence. Professor Newcity adds that " 'sobstvennik' and related terms are not used in Soviet copyright legislation ... because they are not terms that are used in Russian legal drafting to refer to the ownership of copyright." Newcity Reply Decl. ¶ 10. In support of this claim, Professor Newcity advances the proposition that the word "sobstvennik" is not used in post-Soviet copyright law, viz., in the 1993 Law on Copyrights and Neighboring Rights, even though there is obviously no longer an issue of "operative management" to navigate gingerly around. *See id.*

By the mid–1980s the Soviet leadership had come to the realization that the concept of social ownership was not working and that reforms were needed. At the same time, the leaders wanted change to be incremental. Rather than introducing sweeping reforms, the government experimented with projects that pointed toward privatization, but avoided full consummation of private ownership of the means of production. Thus in 1986 the Supreme Soviet (then the highest legislative body in the Soviet Union) authorized family-based economic activity, on the grounds that no one outside the family would have to work for a private person. In 1987 the legislature reformed the organization of the state-owned enterprise, the predominant business form of that era, to give those entities some characteristics of a private firm but without private ownership. In that year it also became possible for foreign private investors to take minority positions in joint ventures established under Soviet law. The following year the parliament enacted a law on cooperatives, which extended the family-business model by permitting private employment but did not leave much (if any) room for passive investors. It was against this background that the lease enterprise was created, first by a decree of the Presidium of the Supreme Soviet in April 1989, and then, following the constitutional reform that led to the establishment of the Congress of Deputies as the highest legislative body, by enactment of the Fundamental Principles on Leasing in December 1989.

The lease enterprise was intended to serve as a bridge to privatization and the creation of a fully private corporation, the legality of which was not confirmed until the Congress of Deputies amended the Soviet Constitution in February 1990. As a result, the legislation establishing lease enterprise provides for attributes that go beyond a narrow conception of leasing. The overall conception of the legislation, as is apparent both from its terms and from the statements of the political and legal authorities who introduced and defended it, is to transfer all the functions, rights and responsibilities of a state-owned firm into a private entity, so that the state would become only the passive recipient of rents and that all the risks and rewards of the business would rest with the private firm. At the same time, the state would retain a reversionary ownership interest so as not to violate the then extant prohibition against private ownership of the means of production. The legislation also left open what would happen to that reversionary interest, anticipating that state ownership would come to an end and that lease enterprises ultimately would be succeeded by private firms with absolute ownership rights.

Lease enterprises were organized to acquire all the assets and liabilities of a state-owned firm in return for rental payments. These arrangements, as leases, had terms, in the case of Soyuzmultfilm ten years. But this did not mean that the lease enterprise acquired only the right to use these assets for ten years, or that it could be returned to its prior form as a state-owned enterprise. The prior entity, having gone through the process of creating a lease enterprise, ceased to exist at the moment of the reorganization. The lease enterprise became the legal successor of the predecessor state-owned firm, possessing all its rights, debts and other legal obligations. The rights received by the lease enterprise included the rights to use and dispose of the property transferred to it for the period of the rent

agreement. After that period, the lease enterprise would either surrender the formerly state property it still retained back to the state or, with the permission of the state, begin the process of privatization. Articles 16(4) and 21(1) of the Fundamental Principles on Leasing (*Osnovy zakonodatel'stva Soyuza SSR i soyuznykh respublik ob arende*) makes this point clearly. In particular, Article 16(4) refers to the lease enterprise as the "recipient" (*preyemnik*) of the ownership rights of the predecessor state enterprise, indicating that a complete transfer of those rights takes place. Article 21(1) further stipulates that all products created by the lease enterprise and all of its receipts will belong to the founders of the lease enterprise even after its obligation to return property to the state matures.

In particular, intellectual property rights transferred to the lease enterprise were not leased, but rather fully owned by the lease enterprise. The lease enterprise had the right to enter into long-term licensing agreements and, within the limits of Soviet law of the time, outright transfers of intellectual property, subject only to the limitation that, at the end of the term of the lease enterprise, its successor would assume the rights and obligations of any contracts into which the lease enterprise has entered. Article 498 of the Civil Code of the R.S.F.S.R., as it was in effect in 1989 and following years, deals with the ownership of intellectual property rights. This provision uses the same word as does Article 16(4) of the Fundamental Principles in addressing what happens upon the reorganization of the rights' owners. Article 498 states that, upon the reorganization of an enterprise, ownership of intellectual property rights passes to the "recipient" (*preyemnik*). There is no question that the conversion of a state enterprise into lease enterprise constitutes a reorganization within the meaning of Article 498. *See* Decl. of Paul B. Stephan of Sept. 12, 2000 [hereinafter "First Stephan Decl."], Ex. 12, attached to Decl. of Julian Lowenfeld, ¶¶ 5–9.

FSUESMS's expert, Professor Maggs, contends that there was never a legitimate transfer of the copyrights from the state enterprise to the lease enterprise, and in the alternative, even if there were, that the expiration of the lease term in 1999 would have effectuated the return of any transferred copyrights to the state. The lessor named in the preamble to the lease is not the state enterprise Soyuzmultfilm but rather Goskino, which, Professor Maggs explains, is not because Goskino is the owner of Soyuzmultfilm's assets but because Goskino "at that time had the right to assign the management of this state property from one organization (the State Enterprise) to another organization (the Lessee Organization)." Maggs Decl. ¶ 24. But the "key question," as Professor Maggs puts it, "is what was the state property, rights to management of which GOSKINO assigned by the lease." *Id.* ¶ 25.

In this connection, Professor Maggs cites the opinion of the Federal Arbitrazh Court for the District of Moscow of August 18, 2000, which is one of the two opinions that vacated lower court decisions and remanded for further consideration in light of the premise that "[l]egal succession of enterprises is determined by the composition of the property, rights, and duties transferred by the statement (balance sheet) of property, rights, and obligations." Maggs Decl. ¶ 30. "According to the lease contract of December 29, 1989, of the Soyuzmultfilm Film Studio," the court wrote, "the fixed and circulating assets were transferred for leased use for a term of 10

years. The question of the transfer of copyrights to the films created in the studio's past were [sic] not decided by the owner in this contract." *Id.*

According to Professor Maggs, the court was clearly directing the attention of the lower court on remand to Article 1.1 of the Lease Contract, which provides:

Lessor grants and Lessee Organization receives in lease the basic and circulating assets (equipment, stock-in-trade, and other goods-material items of value) that are on the balance sheet of the Soyuzmultfilm Film Studio at the time of entry of the present contract into legal force and also receipts from centralized sources in accordance with the plans of capital construction and material-technical support for the 12th and 13th five [year] plans.

*Id.* ¶ 31. It is unclear whether or not film copyrights appeared on the lease enterprise's balance sheet, if such a document ever existed, and plaintiffs have not offered it as an exhibit despite being repeatedly challenged to do so by Professor Maggs and FSUESMS.[32]

Professor Maggs offers two alternatives. If the copyrights do appear on the balance sheet, then they remained state property pursuant to Article 1.2 of the Lease Contract: "[t]he property granted in lease shall remain in state ownership. It shall be under the economic management of the Lessee Organization. The lessor may not alienate this property." *Id.* ¶ 34. The first paragraph of Article 9 of the Fundamental Principles on Leasing suggests a similar outcome: "The grant of property in lease shall not entail the transfer of the right of ownership to this property." *Id.* If, on the other hand, the copyrights do not appear on the lease enterprise's balance sheet or if, as the plaintiffs suggest, there is no balance sheet, then Professor Maggs suggests that the lease enterprise, and therefore, the joint stock company plaintiff, would have no way of proving that the copyrights were ever transferred from the state enterprise Soyuzmultfilm. *See id.* ¶ 35–6.

Professor Maggs then proceeds to cast doubt upon the applicability of Article 16(4) of the Fundamental Principles on Leasing, relied upon by Professor Stephan in his description of Perestroika reforms, *supra*, and providing that "[a] leased enterprise shall become the legal successor of the property rights and duties of the state enterprise assumed in the lease, including also its rights of use of land and other natural resources," *id.* ¶ 37, by arguing that the language of the lease contract did not state that the enterprise itself was being leased but rather transferred only those assets that were included on the balance sheet as of December 20, 1989. *See id.* ¶ 38.

Moreover, even if the lease had been for the enterprise as a whole, Professor Maggs argues that the rights transferred under Article 16(4) would have reverted back to the lessor, the state, after the expiration of the lease term. *See id.* This is because the "General Provisions" of the Fundamental Principles, applicable to the whole statute unless specifically disclaimed, according to Professor Maggs, provide that the lease shall be for "fixed term possession and use." *Id.* Also, para-

---

**32.** At oral argument, the plaintiffs explained that they have not offered a balance sheet because, to their knowledge, one does not exist, *see* Oral Arg. at 34–39, and their position, of course, is that even if there were one, and even if it purported to transfer only the material assets of the state enterprise Soyuzmultfilm to the lease enterprise, this would still not be determinative of the copyright issue, since the copyrights, under plaintiffs' theory, passed not via the lease but by operation of law.

graph 2 of Article 7 of the Fundamental Principles requires the lessee to "return the property after the termination of the contract, a provision which would make no sense if Article 16(4) were read to grant a perpetual transfer of rights from a state enterprise to a lease enterprise." *Id.*

Of course, having made this argument, Professor Maggs must account somehow for what is expressly stated in Article 16(4), namely, that the lease enterprise shall succeed to the property rights and duties of the state enterprise. In his view, Article 16(4) has the purpose not of transferring anything beyond what is included on the balance sheet but of overcoming a general rule against assignment of rights in certain types of property, such as land. *See id.* ¶ 39. Land was typically "not under the 'operative management' of state enterprises, but rather was used by the state enterprise under a non-assignable right of use." *Id.* By referring to the lease enterprise as a "successor" and not as an "assignee," Article 16(4) manages to overcome the prohibition on assignment and effect a temporary transfer of rights; but the transfer was never intended to exceed the length of the lease term. *See id.*

Professor Maggs claims that a nonsensical result would follow from plaintiffs' reading of Article 16(4). "Rights of land use" are explicitly mentioned among the rights which a lease enterprise succeeds to when it steps into the shoes of a state enterprise. Consistent with plaintiffs' reading of the article, this succession would have to be perpetual. Yet, in the case at bar, the physical property—the church building and land under and around it on which the state enterprise Soyuzmultfilm Studio and its successor, the lease enterprise Soyuzmultfilm Studio, conducted their affairs—were returned to the state after the expiration of the lease term in 1999. This is undisputed, and it is,

in fact, the very reason that FSUESMS was able to occupy the Church of St. Nicholas the Enlightener pursuant to the Stepashin decree in 1999. SMS had moved out to a Krasnogorsk location, taking with it only its claims to the film library that had accumulated over the many decades of the state enterprise Soyuzmultfilm Studio's existence. Professor Maggs contends that SMS had no choice but to leave its premises: "I believe [the building and land] were returned because the law was absolutely clear that they could not be retained." *Id.* "To show how ridiculous Plaintiffs' theory is," Professor Maggs writes, "the theory would mean if a state farm enterprise (which under Soviet law had the right to use, but not other rights in the state land that it farmed) were leased, then the Lessee Organization, at the end of the lease, would have to give back the tractors but keep the farm land forever." *Id.*

Even if the lease enterprise had obtained the right to use the copyrights to the pre–1989 films, Professor Maggs continues, it would not have been able to license them to FBJ. *See id.* ¶ 41. Article 18 of the Fundamental Principles on Leasing permits transfer only of "material valuables," which intellectual property is not. *See id.* ¶ 42.

Professor Maggs also faults Professor Stephan's analysis insofar as the latter refers to the lease enterprise as a "bridge to privatization." *Id.* ¶ 61. "[Professor Stephan] fails to point out that under Article 10 of the Fundamental Principles [on Leasing] there were two types of leasing arrangement, those where the contract of lease did and those where it did not provide for a buyout by the Lessee Organization. The lease contract in the present case had no right of buyout. So it did not provide a 'bridge to privatization.'" *Id.*

Professor Newcity responds to Professor Maggs' theory of the lease transfer (or

lack thereof) by arguing that Professor Maggs has gone about his analysis in an entirely misguided manner:

> Professor Maggs devotes a substantial portion of his Declaration to a discussion of the question whether ownership of the copyrights in the films was transferred from the State Enterprise to the Lease Enterprise by the Lease Agreement. However, he completely ignores the fact that upon reorganization of the State Enterprise the ownership of these copyrights transferred from the State Enterprise to the Lease Enterprise by operation of law. As such, this transfer was not dependent on the provisions of the Lease Agreement and much of Professor Maggs' analysis is irrelevant.

First Newcity Decl. ¶ 54. Article 498 of the 1964 R.S.F.S.R. Civil Code is the law to which Professor Newcity is principally referring. *See id.* ¶ 55. That article, it might be recalled, provided that "[i]n case of the reorganization of the organization which owns it, the copyright is transferred to its successor in title, and in case of its liquidation, to the state." *See id.* This provision accords with Article 37 of the Civil Code, which appears in the General Principles of the Code:

> *Article 37. Dissolution of a Juridical Person*
>
> A juridical person can be dissolved by means of liquidation or reorganization (merger, division, and accession).
>
> In the case of merger and division of juridical persons, the property (rights and obligations) passes to the newly constituted juridical persons. In the case of accession of one person to another, its property (rights and obligations) passes to the latter. The ownership passes on the day of signature of the transfer balance, unless other provision is made by the law or decree for reorganization.

> The method of liquidation and reorganization of a juridical person is laid down by legislation of the USSR and by decrees of the Council of Ministers of the RSFSR.

*Id.* ¶ 56.

According to Professor Newcity, "the reorganization of the State Enterprise into the Lease Enterprise in 1989 represented a transformation of the enterprise as provided for by the Law on State Enterprises (Associations)." *Id.* Professor Stephan expands upon this point:

> To effectuate the policy of encouraging direct economic incentives for producers, the [Fundamental Principles on Leasing] permitted a complete transformation of a state enterprise into a lease enterprise, resulting in the disappearance of the state enterprise and the emergence of the privately owned lease enterprise as its legal successor. The assets of the lease enterprise would consist of both property leased from the state (not from the former state enterprise, which ceased to exist) and of assets belonging to the former state enterprise that passed through rights of succession under Article 498 of the Civil Code of 1964, rather than through the lease. Articles 9 and 10 of the [Fundamental Principles on Leasing] specify the ownership of property leased from the state and stipulate that at the end of the lease the state property must either revert to the state or be bought out by the lease enterprise. But Article 16, which recognizes that ownership of other property could pass to the lease enterprise through succession rather than by lease or purchase, indicates the legislature's acceptance of the proposition that a lease enterprise could acquire interests under the normal operation of the rules of the Civil Code outside the scope of the lease contract. Rights to

which a lease enterprise could succeed under Article 498 include copyrights, which belonged to the state enterprise rather than its supervising agency and which, pursuant to the legislation of perestroyka, included the right to derive hard currency earnings from foreign exploitation.

Professor Maggs claims that copyrights could pass to a lease enterprise only if specified on the balance sheet of the state entity that was transformed into the lease enterprise. This is incorrect. Neither the Law on the State Enterprise nor the Fundamentals on Leasing give such conclusive effect to the balance sheet; indeed, the Fundamentals do not refer to the balance sheet at all. Article 4 of the Fundamentals states that the right to lease property belongs to the owner of that property. The lease between Goskino and [the lease enterprise Soyuzmultfilm Studio] therefore covered only property under the management of Goskino, and had no bearing on those interests belonging to [the state enterprise Soyuzmultfilm Studio] in its own right. The land occupied by the studio and other material assets (such as film stock) was under the operative management of the higher bureaucratic agency, Goskino. [The lease enterprise Soyuzmultfilm Studio] obtained only such an interest in those assets as Goskino conveyed by lease. But as to other rights—the copyrights, contracts with the skilled employees of the studio, the know-how on which a creative enterprise rests, past awards and the reputation that went with them, indeed almost everything that would make a film studio valuable—[the lease enterprise Soyuzmultfilm Studio] obtained ownership by stepping into the shoes of its predecessor pursuant to Ar-

ticle 498 of the Civil Code, not by lease based on the Fundamentals.

Second Stephan Decl. ¶¶ 7–8.

Professor Maggs, as Professor Stephan points out, seeks to avoid this result, viz., the passing of the copyrights by operation of law to the lease enterprise Soyuzmultfilm Studio upon the reorganization of the State Enterprise Soyuzmultfilm Studio, by suggesting that the state enterprise Soyuzmultfilm Studio and FSUESMS are one and the same. *See* Maggs Decl. ¶ 11. The state enterprise continued to exist between 1989 and 1999, the argument would go. The consequence of such a state of affairs would be that the state enterprise Soyuzmutfilm Studio held a reversion interest in the film copyrights which vested at the end of the lease term. *See* Stephan Decl. ¶ 9. Professor Maggs never makes this argument explicitly and at no point offers any reason whatsoever to think that the state enterprise Soyuzmultfilm Studio continued to exist in some quiescent form after the 1989 creation of the lease enterprise. The most Professor Maggs does claim is that the reason the state enterprise was forced to register an amended charter in 1999 as a federal state unitarian enterprise was due to changes in the law which abolished the state enterprise form. *See* Maggs Decl. ¶ 11. But those changes, namely the adoption of the Civil Code of the Russian Federation, First Part, came in 1994. *See id.* The state enterprise Soyuzmultfilm ceased all operations in 1989 when the lease enterprise came into existence and registered its amended charter in 1999, five years after the adoption of the 1994 law which allegedly created the necessity for the amendment. Professor Maggs can point to not so much as a single act to suggest signs of life on the part of the state enterprise during the period 1989 to 1999. Professor Stephan adds: "The belated attempt of [FSUESMS] to declare itself the successor to [the state enterprise

Soyuzmultfilm Studio] does not accord with Russian law in any respect." Stephan Decl. ¶ 10. This understanding finds recent support in the June 4, 2001 decision of the Federal Arbitrazh Court for the District of Moscow.

In his reply declaration, Professor Maggs attempts to cast doubt upon the notion that the lease enterprise was the legal successor of the state enterprise. The lease enterprise's charter, he notes, did not indicate that it was the state enterprise's successor, which, he says, was in contravention of the "universal practice in the drafting of charters in the Soviet Union and Russia when [a] new enterprise claims to be the legal successor of a prior enterprise." Maggs Reply Decl. ¶ 4. In addition, nothing in the charter indicates a claim to the ownership of the state enterprise's copyrights. *See id.*

Professor Maggs also places much stock in a September 28, 1999 Information Letter of the High Arbitrazh Court. *See id.* Information Letters, Professor Maggs explains, are documents through which the High Arbitrazh Court regularly gives guidance to lower courts by stating the facts and holdings of cases correctly decided by the lower courts. *See id.* The lower arbitrazh courts are expected to follow the guidance offered or risk reversal. *See id.* This particular Information Letter involved the 1990 transfer of physical assets and personnel from a film studio to an entity created by a reorganization. *See id.* ¶ 6. The principal question was whether copyrights previously made by the film studio were transferred as part of the reorganization. *See id.*

According to Professor Maggs, the Information Letter "indicated that the argument that there was automatic succession 'is contrary to law, since legal succession of enterprises is determined by the content of the property, rights, and obligations trans-

ferred by the statement (balance).' " *Id.* ¶ 7. This language, Professor Maggs writes, "refutes the statement in Paragraph 51 of Michael Newcity's Declaration, 'Under Article 498, in the event that a state enterprise that owns a copyright is reorganized, its copyrights are transferred to its successor.' " *Id.*

The relevance and import of the Information Letter, which, if it truly meant what Professor Maggs insists it means, would be devastating to plaintiffs' case, is questioned by both Professor Newcity and Professor Stephan. Professor Newcity writes:

> Professor Maggs refers extensively to an Informational Letter from the Higher Arbitrazh Court, dated September 28, 1999, which relates to the transfer of ownership from a state enterprise-film studio to a new legal entity. Professor Maggs cites this Informational Letter for the proposition that the copyright in films produced by a state enterprise was not automatically transferred to "an entity created by a reorganization." This Informational Letter, however, is not applicable to the situation in this case because it relates to a fundamentally different and inapplicable form of reorganization.
>
> As I explained in my Declaration, Soviet law recognized several different forms or reorganization of state enterprises. When the State Enterprise was reorganized as a lease enterprise, the form of reorganization followed was a "transformation" (in Russian, *preobrazovanie* ... ) under which the original enterprise was reorganized into a new enterprise. Under a transformation the old enterprise ceased to exist and was succeeded by the new enterprise. This is the process that occurred when the State Enterprise was transformed into the Lease Enterprise; the State Enter-

prise ceased to exist and, under Article 498 of the RSFSR Civil Code, the Lease Enterprise succeeded by operation of law to the ownership of the now-defunct State Enterprise's copyrights.

This is not the form of reorganization that occurred in the case discussed in the Informational Letter. As a result, the Informational Letter is wholly inapplicable to the present case. The first line of the text of the Informational Letter specifies that the form of reorganization that occurred in that case was a "separation" or "spin-off" (in Russian, *vydelenie* ... ). This form of reorganization is provided for in Article 23(1) of the Law on State Enterprises (Associations), which was adopted on June 30, 1987, and in later Soviet legislation. In this form of reorganization, discrete units within an enterprise are spun-off from an existing enterprise. One of the important features of this form of reorganization is that the parent enterprise does not cease to exist. Thus, after this form of reorganization occurred, the parent enterprise and one or more daughter enterprises would exist simultaneously. In such a reorganization it was obviously essential that there be a clear agreed-upon delineation of which assets of the parent enterprise were being transferred to the daughter enterprise(s). There was no automatic succession by the daughter enterprise to the ownership of the parent's assets since the parent continued in existence. For this obvious reason, the provisions of Article 498 of the RSFSR Civil Code, which relate to succession of ownership of copyright when one enterprise ceases to exist and is succeeded by another enterprise, did not apply. Thus, the

situation described in the Informational Letter is completely different from the reorganization that occurred when the State Enterprise was reorganized into the Lease Enterprise. Consequently, this Informational Letter has no bearing on this case.

Newcity Reply ¶¶ 14–16 (footnote and citations omitted).

Professor Stephan is in agreement. According to him, Professor Maggs has failed to note that the Information Letter is a "straightforward application of Article 37(6) of the U.S.S.R. Law on Enterprises, enacted June 4, 1990, as well as the almost identical Article 37(7) of the R.S.F.S.R. Law on Enterprises and Entrepeneurial Activity, enacted December 25, 1990." *Id.* ¶ 10. The U.S.S.R. law reads:

> Should one or several new enterprises be detached from the enterprise, the property rights and obligations of the reorganized enterprise shall be transferred, in the appropriate proportions, to each of them, by means of the act of division (balance).

*Id.* By way of contrast, the U.S.S.R. Law goes on to state, in article 37(7), that if "one enterprise is transformed into another, all property rights and obligations of the previous enterprise shall be transferred to the newly created enterprise." [33] *Id.*

"The September 29, 1999, information letter explicitly deals with a split-up situation, not with a legal transformation. The conversion of [the state enterprise Soyuzmultfilm Studio] into [the lease enterprise Soyuzmultfilm Studio], by contrast, was a legal transformation." Stephan Reply Decl. ¶ 11. Professor Stephan adds, "Both the U.S.S.R. and R.S.F.S.R. statutes made

---

**33.** The R.S.F.S.R. equivalent to 37(7) is 37(8). The number designations are off by one. *See* *id.*

clear that transformations were different from split-ups, that different rules applied to the former, and that no balance or similar contract-type document was necessary to achieve a transfer of immaterial rights in the case of transformations." *Id.* ¶ 11.

The first sentence of the High Arbitrazh Court's Information Letter is, indeed, very clear in delineating the form or reorganization to which it applies: "If, in the separation of a new enterprise from an enterprise that is the possessor[34] ... of copyrights, the question of the transfer of copyrights to the new legal entity is not decided, then the latter may not be recognized as holder of these rights." Information Letter, Ex. 1, attached to Reply Decl. of Robert W. Clarida. Professor Maggs' response to this point in his Sur–Reply Declaration is that Professor Newcity—and, by implication, Professor Stephan—err in applying "a common law mode of analysis in a civil law jurisdiction, by trying to narrow the holding of the case summarized in the Informational Letter to its exact facts." Maggs Sur–Reply Decl. ¶ 4. "In the Russian civil law tradition," he continues, "lower courts look to broad legal principles stated by the higher courts. They do not engage in the nice distinctions between 'holding' and 'dictum' that are characteristic of the common law." *Id.*

Unfortunately for Professor Maggs' argument, the plaintiffs' position with respect to the Information Letter has the distinct virtue of making perfect sense.

As Professor Newcity explains, while there is every reason to itemize the property conveyed in a partial transfer, that is, a spin-off or separation, the same need does not exist to itemize everything that is transferred in a full transformation, where one enterprise steps into the shoes of its predecessor, since the totality of the first enterprise's assets would be transferred to its successor. Surely, Professor Maggs cannot mean to suggest that the Information Letter, although it very clearly and unambiguously states, "If, in the separation of a new enterprise from an enterprise that is the possessor ... of copyrights ...," will be read by lower courts to apply to situations that do not involve the separation of a new enterprise, but rather, the reorganization of one enterprise into another. Such a reading would not only fail to account for the court's very specific language but would give license to broaden virtually any holding to facts clearly beyond its scope.

Not only, therefore, is Professor Maggs' position on this issue hardly sustainable on its face, implying, as it would, that a lower court would apply a higher court's decision to facts to which that decision is not addressed and clearly irrelevant, but it is rendered even less sustainable in light of the fact that Professor Maggs himself engaged in the very kind of distinction between holding and dicta that he has claimed Russian courts do not honor in attempting to diminish the importance of the December 26, 2000 decision on remand by the Moscow Region Arbitrazh Court,

---

**34.** Professor Newcity takes issue with Professor Maggs' translation of this word as "possessor." *See* Newcity Reply Decl. ¶ 9. The Russian original is the word "vladelets," which according to Professor Newcity, should really have been translated as "owner" or "proprietor." *Id.* According to a recent dictionary of Russian legal terms consulted by Professor Newcity, the phrase "vladelets avtorskogo prava" is specifically translated "copyright owner." *Id.* Professor Newcity implies that Professor Maggs has avoided that translation in order to evade the acknowledgment that a state enterprise could be a copyright owner. *See id.* For what it is worth, a Russian dictionary available to the court gives "owner" as the sole translation of "vladelets." *See* KENNETH KATZNER, ENGLISH–RUSSIAN RUSSIAN–ENGLISH DICTIONARY 453 (1984).

which, more or less, adopted virtually every aspect of plaintiffs' theory of the case. After noting that the Moscow Region Arbitrazh Court "holds that [FSUESMS has] no standing to complain of the transfer of property from the Lessee Organization to the Joint Stock Company, even if [FSUESMS has] valid claims that the transfer lists includes property belonging to [it]," Professor Maggs goes on to say that "[t]he decision also contains a great deal of discussion about why the court believes [FSUESMS has] failed to prove that [it] had any rights, but this discussion is rendered largely irrelevant by the court's decision on lack of standing." Maggs Reply ¶ 12. This "great deal of discussion," which most readers would take for the central holding of the case, is thus dismissed as dicta by Professor Maggs.[35] Not only is his analysis on this point not convincing, but it has the additional drawback of casting doubt upon the proposition that he now advances, viz., that Russian courts do not distinguish between holding and dicta. The upshot of this discussion, in short, is that the Information Letter adduced by and heavily relied upon by Professor Maggs is all-too-obviously irrelevant to the case at bar.

Professor Maggs does offer a second argument in favor of the applicability of the Information Letter, namely, that plaintiffs' experts are assuming their conclusion by assuming the lease enterprise to be the legal successor to all the rights of the state enterprise as opposed to just some of the rights. *See* Maggs Sur–Reply ¶ 4. These assumptions, according to Professor Maggs, "are contrary to the now admitted fact that the most valuable rights claimed by the lessee enterprise—the copyrights, were not included in the balance sheet incorporated by reference in the contract." *Id.*

Professor Maggs argument is quite circular, however. His proposition to be proven is that the copyrights had to be included on the lease enterprise's balance sheet to have been legitimately transferred. In support of this proposition, he adduces the Information Letter, which applies only in those instances where there is a partial as opposed to a complete transfer of interest from an enterprise to its successor. To prove that the transfer of interest in the case at bar is not complete, Professor Maggs summons to mind the fact that the balance sheet contains no mention of the copyrights, which were, therefore, not transferred. But, of course, the notion that the failure to include the copyrights on the balance sheet implies that they were not transferred is precisely the proposition to be proven. Hence, the circularity. Professor Maggs has still not offered a single fact that would stand in the way of this court concluding that the state enterprise Soyuzmultfilm Studio was fully transformed into the lease enterprise bearing, for good reason, the same name.

Professor Stephan also disputes Professor Maggs' claim that the inclusion of the fact that an enterprise has succeeded to the position of another enterprise has been a universal practice in the drafting of charters in the Soviet Union and Russia. "This assertion is simply untrue," he says. Stephan Reply Decl. ¶ 3. "Assertions in the Charter cannot change the property rights

---

**35.** In fact, the joint reply brief of defendants and FSUESMS contains the following sentence, which makes the same dicta / holding distinction even more explicit: "Thus, Professor Maggs concludes that no Russian court would follow the *dicta* of the December 26, 2000 decision with regard to the transfer of rights, but would instead be guided by the contrary holding set forth in the Information Letter of the Higher Arbitrazh Court." *See* Jnt. Reply Mem. Law of Defs. and Third Party Pls. Supp. Their Cross–Mot. for Sum. J. [hereinafter "Jnt. Reply"] at 6 (emphasis in original).

of the enterprise. The implication of Professor Maggs' argument is that documents generated by a Soviet-era enterprise ... have the capacity to determine what that enterprise owned." *Id.* "This assertion, if true, would imply that Soviet law of the perestroyka erased the boundaries between property and contract law by allowing essentially contractual documents to dictate property rights. Soviet law did no such thing." *Id.*

Professor Maggs' response to this point in his sur-reply is more credible than his arguments with respect to the Information Letter. He notes that he is in complete agreement with Professor Stephan that assertions made in an organization's charter cannot alter the underlying property rights held by that organization. Maggs Sur–Reply Decl. ¶ 5. The point to be made is not that such assertions have legally binding effect but rather that, in his opinion, it is a universal practice to note in the Charter when an enterprise is the legal successor of a former enterprise. *See id.* The absence of such a notation would, then, be suggestive as an evidentiary matter. But Professor Stephan has also denied that it is a universal custom to include this information in the Charter. *See* Stephan Reply Decl. ¶ 3. Having no further basis for knowing who is right, the court will have to content itself with leaving the issue, which, in any case, is not dispositive, open.

The same need not be said, however, about the broader issue of the transfer of copyrights from the state entity Soyuzmultfilm Studio to the lease entity Soyuzmultfilm Studio. It is apparent that the disputed copyrights passed by operation of law, viz., Article 498 of the 1964 Civil Code of the R.S.F.S.R., from the state entity to the lease entity upon the transformation of the former into the latter. FSUESMS's and Professor Maggs' half-hearted suggestions that FSUESMS is the same entity as the defunct state enterprise Soyuzmultfilm Studio amount to a transparent attempt to revive a disinterred corpse and give it all the cosmetic accoutrements of the living. Unfortunately, the enterprise's ten-year sojourn through limbo has left its unmistakable mark and rendered the attempt to claim it as an amended form of the state enterprise a futile exercise in reincarnation. This is a determination that has been explicitly made by Russian courts in the April 3, 2001 decision upholding the registration of FSUESMS and the April 20, 2001 decision by the Federal Arbitrazh Court for the District of Moscow upholding the April 3 decision. These decisions found that FSUESMS was a new entity created in 1999 and that the state enterprise Soyuzmultfilm Studio had ceased to exist in 1989, when it was transformed into the lease enterprise.[36]

The legislation of the Perestroika period gave substance to the germinal copyrights

---

**36.** FSUESMS attempts to label this aspect of the decisions erroneous dicta. *See* Jnt. Suppl. Mem. Law of Defs. and Third Party Pls. Further Supp. of Their Cross–Mots. for Sum. J. at 9. However, they are anything but dicta, since when the appeals court, on April 3, 2001, reviewed the January 25, 2001 decision of the lower court which had found FSUESMS's registration to be valid and succession rights to have been determined by the content of the lease enterprise's balance sheet, the appeals court specifically affirmed the holding but provided new reasoning, reversing the lower court's finding that the balance sheet determined the right of succession. Moreover, as the June 4, 2001 decision by the Moscow Arbitrazh Court for the District of Moscow states, FSUESMS specifically appealed the April 3, 2001 decision with respect to the "motivational part" of the ruling, in other words, the reasoning. If that reasoning were truly dicta, there would, of course, be no good reason to appeal it. But FSUESMS did appeal it, and that appeal was denied. Therefore, FSUESMS's current suggestion that the finding that the state enterprise ceased to exist when the lease enterprise succeeded it was just dicta is very obviously mistaken.

awarded to the state enterprise Soyuz-multfilm Studio under Soviet law and transferred those copyrights to the lease enterprise that succeeded it. As the Moscow Region Arbitrazh Court wrote in its opinion on remand on December 26, 2000:

> [FSUESMS'] argument that the copyrights to the animated films belong to [FSUESMS] has no foundation, based on the submitted documents and oral arguments of both sides in the lawsuit, because, pursuant to Articles 23, 37 of the RSFSR Civil Code and Article 11 of the Fundamentals of Civil Legislation USSR and Republics, a state enterprise, after leasing out an enterprise and complex of facilities and property, could not exist anymore, and could no longer be a legal person at the same time because it did not have its own property and legal capacity.
>
> When leasing out an enterprise (state property) [takes] place in accordance with paragraph 4, Article 16 of the Fundamental Principles on Lease, which established full succession of rights to the state enterprise assumed by the [l]ease [e]nterprise, then according to Article 37 of the RSFSR Civil Code[,] this action shall constitute an actual reorganization of a state enterprise.

*See* Dec. 26 Dec.

It might appear, on the face of it, that the holding and reasoning of the December 26, 2000 decision would have been undermined by the April 20, 2001 Federal Arbitrazh Court for the District of Moscow. Several important factors weigh heavily against any such notion, however. First, there is the September 19, 2000 response by the Higher Arbitrazh Court of the Russian Federation to the Federal Arbitrazh Court's initial August 18, 2000 decision to vacate and remand previous lower court rulings. Professor Stephan describes the significance of the high court's statement:

> A suggestion that the Higher Arbitrazh Court does not endorse the reasoning of the intermediate court can be found in its September 19, 2000, ruling regarding the appeal of the intermediate court's August 18 opinion. Normally the Higher Court, in declining to accept an appeal, states only that "a basis for accepting an objection is not presented," a formulation that is as standardized as our Supreme Court's statement that "the petition for certiorari is denied." In its September 19 ruling, however, the Higher Court went out of its way to state that the intermediate court's decision "does not constitute an evaluation of the evidence in a new hearing in this case or represent the conclusions of the court regarding whether [the claim] is subject to satisfaction or not." In simpler terms, the Higher Court stated what it normally does not say, namely that the decision of the intermediate court to remand a case for further proceedings should have no bearing on what the lower court should do upon remand. Only after making this observation did the Higher Court indicate that its intervention at this time would be premature. In context, this statement is a strong signal to the lower arbitrazh court that it should not regard itself as bound by any of the speculations contained in the August 18 opinion of the intermediate court. Accordingly, on remand the lower court on December 26, 2000, confirmed its earlier determination that [the lease enterprise] owned the copyrights at issue in this litigation and thus had the capacity to transfer them in 1999 to its legal successor, the joint stock company.

Second Stephan Decl. ¶ 15 (footnote omitted).

Professor Maggs points out that this is not a "ruling" but an "unpublished informal letter from a court official suggesting that a formal filing of an objection would be futile, since such an objection would be rejected on the ground that the Joint Stock Company would have the chance to present its evidence to the trial court on remand." Maggs Reply Decl. ¶ 11. He proceeds to say that he does not believe that "any Russian court would give such an informal letter any weight whatsoever in determining what the substantive law might be—the letter gave only informal advice on a procedural matter—whether a decision was ripe for review." *Id.* Nevertheless, Professor Maggs does not dispute that the Higher Arbitrazh Court's letter, however informal it might have been, was an unusual means of proceeding, whereas the usual "a basis for accepting an objection is not presented" would have been sufficient to inform the parties that the case was not yet ripe for review. The implication, in other words, is that the Higher Arbitrazh Court may have a different view of the case than does the Federal Arbitazh Court for the District of Moscow, and now that the latter court has issued a binding opinion, the time for review may have arrived.

Even more telling than such speculation, however, is the actual opinion issued by the Federal Arbitrazh Court for the District of Moscow. The opinion is, in a word, incoherent and, more important, irrelevant to the issue of copyright transfer. The court's reasoning does not support the conclusion that it reaches. "According to the property transfer act, there was transferred to the joint stock company the *tangible* assets owned by the state for separate accounting as state property in

accordance with Annex No. 2," the court writes. Apr. 20 Dec. at 6 (emphasis added). "The transfer of state property was made in violation of Article 209 of the Civil Code of the Russian Federation, which provides that only property owner has the rights of ownership, use and disposal of its property." *Id.* "The consent of the owner of state property [i .e. the state] was never obtained," the court continues. *Id.* "Therefore, the leased enterprise, in violation of the aforementioned legal requirements, disposed of the state property by transferring it to the joint stock company." *Id.*

The problem with this line of reasoning is that the tangible property, the land and equipment, etc., was returned to the state upon the expiration of the lease term. This is precisely why SMS moved out of the Church of St. Nicholas the Enlightener and into its new Krasnogorsk location. But what about the intangible property, SMS's most valuable asset, the most important asset underlying the dispute between the two companies claiming to be Soyuzmultfilm Studio? Shockingly, the court says absolutely nothing about this. In fact, Article 498, the crucial provision relating to the transfer by operation of law of copyrights and other intellectual property from the lease enterprise to the joint stock company, is nowhere mentioned in the April 20 opinion. The closest the court comes is writing, in summarizing what it takes to be the lower court's opinion, that the lower court found that "[b]ecause the succession to the rights is based in law (Article 486 of the Civil Code of the former Russian Soviet Federative Socialist Republic,[37] Article 58 of the Civil Code of the Russian Federation), it cannot be limited by lease agreement." *Id.* at 4. The court

---

**37.** Article 486, as the reader might remember, has absolutely nothing to do with succession or transfer of anything but is, rather, the article that vests copyright ownership in films in the enterprise that produced them.

at no point returns to this discussion, nor does it explain why the lower court's conclusion was incorrect.

All in all, then, the entire opinion seems absolutely irrelevant to the issue of whether the film copyrights were properly transferred, which, although important to the dispute at bar, was not legally dispositive on the issue of the validity of SMS's registration. The court never claims them to have been state property (rather, it is careful to specify that the *tangible* property belonged to the state); it never claims that they were transferred by way of the lease; it never protests that the owner's consent to their transfer was not obtained; they are, in short, absent from the opinion which, as a whole, may be reconstructed as follows: (1) the tangible property transferred to the joint stock company belonged to the state; [ (2) but, of course, the tangible property was returned to the state upon the expiration of the lease term;] (3) the state did not consent to its transfer; (4) therefore, the joint stock company did not properly receive its assets, and its registration should be nullified.[38]

It may be safely concluded, then, that the reasoning of the December 26, 2000 opinion emerges not only unscathed but unexamined. Even if this court might question the basis for the April 20, 2001 ruling, therefore, there is no need to fly in the face of a Russian court decision, because the case at bar presents the issue of copyright ownership, which had nothing to do with the holding of the April 20, 2001 decision.[39] The copyrights were passed by operation of law to the lease enterprise, which then conveyed them to the joint stock company.

This conclusion also finds ample support in the Russian court decisions in the case filed by SMS against FSUESMS, namely the April 3, 2001 decision of the appeals court and, even more significantly, the June 4, 2001 decision of the Federal Arbitrazh Court for the District of Moscow affirming the April 3 decision. This last decision was issued by the same court that invalidated SMS's registration in the April 20 decision and, moreover, post-dated that decision. Both courts, although recognizing the validity of FSUESMS's registration, clearly and unequivocally stated that the state enterprise ceased to exist in 1989 when it was reorganized into the lease enterprise and that the lease enterprise was then transformed into the joint stock company SMS. *See* Excerpts from these decisions *supra.* Both courts, further found that, while the state property mentioned in the lease enterprise's balance

---

**38.** The opinion may be saying, simply, that insofar as SMS incorporated into its charter assets belonging to the state without the consent of the state, its charter was invalid, and it is, therefore, irrelevant that the state property might have been returned to the state thereafter, when the lease expired. It is, moreover, irrelevant that intangible assets not belonging to the state may have been legitimately passed to the joint stock company SMS in the same transfer document. The point is that the joint stock company SMS tried to transfer to itself state property, which it had no right to do, and this alone makes its registration invalid. In this case, however, the opinion would still say absolutely nothing about copyright ownership.

**39.** The parties have offered conflicting views of the role of res judicata and collateral estoppel in the Russian court system, with plaintiffs suggesting that that decision has no res judicata effect while FSUESMS and defendants argue that it does. There is no need to resolve this issue here, since the dispute between the parties did not concern the same subject matter as the dispute here, viz., ownership of the disputed copyrights. The Russian court decisions were merely about the validity of the registration of SMS. The copyright ownership question was not necessarily decided there, as the April 20 decision's reasoning makes very clear.

sheet, i.e., the material assets, were returned to the state in 1999, upon the expiration of the lease term, the other rights and assets of the lease enterprise, which, of course, included copyrights, were transferred to the lease enterprise when the state enterprise ceased to exist in 1989 and were transferred, in turn, to SMS in 1999.[40] Whether or not FSUESMS will be ultimately successful in holding on to its registration as a legitimate organization in its own right and laying claim to the physical property of the Church of St. Nicholas the Enlightener is a question not before this court. However, as far as the copyrights of the state enterprise Soyuzmultfilm go, to these FSUESMS has no claim.

### (4)

■ Having resolved the issue of the transfer of film copyrights from the state enterprise to the lease enterprise, it would seem that it remains now to be determined whether or not the international distribution rights to the films were legitimately transferred from the lease enterprise to plaintiff FBJ. FSUESMS argues that "[p]laintiffs have … failed to satisfy the requirement of § 204(a) of the U.S. Copyright Act, 17 U.S.C., which provides that 'a transfer of copyright ownership, other than by operation of law, is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent." FSUESMS's Cross–Mot. at 8.

According to FSUESMS, "Plaintiffs have produced *no* documents that even purport to constitute a transfer of copyright ownership from the State, either to (1) Soviet [Soyuzmultfilm Studio] or to (2) its alleged legal successor, the lease enterprise, or to (3) the lease enterprise's alleged successor, JSC." *Id.* FSUESMS expands upon this argument:

> The one document of transfer upon which plaintiffs do rely, the 1992 "exclusive distribution agreement" between FBJ and the lease enterprise, fails to establish a transfer of any subsisting rights to plaintiff for two reasons. First, it purports to grant rights which the lease enterprise did not have the power to convey. Second, even assuming that the lease enterprise had the power to grant exclusive distribution rights in the Films during the term of its ten-year lease from Goskino, that power did not and could not extend beyond the term of the lease, which ended in December 1999.

*Id.*

FSUESMS's arguments are flawed insofar as they implicitly depend on assumptions that have already been rejected by

---

40. The parties dispute whether the April 20 invalidation of SMS's registration has already taken effect or has not taken effect and is easily remediable by SMS. The June 4, 2001 decision, which affirmed the appeals court's April 3 decision finding that the joint stock company succeeded to the rights of the lease enterprise, seems to bolster plaintiffs' position that the registration cancellation has nothing to do with the issue of rightful succession. However, there is no need to decide the issue definitively here, since even if the joint stock company SMS was invalidly registered, the conclusion that the lease enterprise owned the copyrights at the time it concluded the licensing agreement with FBJ would remain undisturbed, because, as discussed above, those copyrights would have passed to the lease enterprise by operation of law (Article 498) when the state enterprise Soyuzmultfilm Studio ceased to exist in 1989. Thus, FBJ's rights under the agreement would still be enforceable against anyone currently claiming ownership of the copyrights. Because this state of affairs would mean that FBJ's injunction on consent against the defendants would have been validly obtained, there is no need to go further.

this court. First of all, because the copyrights in the films never belonged to the state to begin with,[41] there was no requirement that a conveyance instrument explicitly transfer the copyrights from the state to the lease enterprise, especially in light of the fact that the copyrights were transferred to the lease enterprise by operation of law. For that same reason, the expiration of the lease agreement between Goskino and the lease enterprise Soyuzmultfilm did not end the assignment of copyrights to FBJ. As the Moscow Region Arbitrazh Court put it in its decision on remand:

> Copyrights were not and could not be transferred by the lease agreement because they had been transferred by operation of law and cannot be limited by an agreement.

> Therefore the copyrights of the lease enterprise are not related to the issues of the lease agreement and the expiration of that agreement does not cause the copyrights of the [l]ease enterprise "Film Studios Soyuzmultfilm" to expire.

> At the time of the transformation of the [l]ease enterprise into a [shareholding] company the lease enterprise had the copyrights to its animated film by law.

Dec. 26 Dec.

This is sufficient to address FSUESMS's arguments about the invalidity of the transfer insofar as they depend on the need for a document conveying upon the lease enterprise the right to alienate its copyrights. However, insofar as FSUESMS's argument about the invalidity of the transfer to FBJ is premised on any lack of formalities under 17 U.S.C. § 204(a) in the distribution agreement between the lease enterprise Soyuzmultfilm and plaintiff FBJ, there is no need to determine whether or not the strictures of § 204(a) have been satisfied. The reason is that neither defendants nor FSUESMS have standing to contest the validity of the transfer.[42]

In *Eden Toys, Inc. v. Florelee Undergarment Co.*, 697 F.2d 27 (2nd Cir.1982), an infringer attempted to contest the validity of a copyright transfer between a grantor and grantee. *See id.* at 36. The plaintiff grantee had not complied with the formalities of 17 U.S.C. § 204(a), which provides that a grant "is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing

---

**41.** At most, as has been noted at length above, the state reserved to itself various exploitation rights, and even those were reintegrated into the underlying copyrights during the Perestroika era.

**42.** It is worth pausing briefly to address the choice of law questions that arise in connection with the transfer of copyrights. First, while *Itar–Tass* decided the choice of law issue with respect to ownership of copyrights, it expressly excluded the transfer of copyrights from the scope of its holding: "[W]e consider only initial ownership, and have no occasion to consider choice of law issues concerning assignment of rights." *Itar–Tass*, 153 F.3d at 91, n. 11.

Likewise, no occasion to consider choice of law issues concerning assignment of rights presents itself in the case at bar. While defendants and FSUESMS argue that the assignment of rights by the lease enterprise to FBJ is invalid because the former never had those rights to convey, this is really an argument about ownership, not about transfer, and Russian law consequently applies. Where, however, defendants and FSUESMS dispute the effectiveness and formality of the transfer itself, there is no need to reach the choice of law issue because neither defendants nor FSUESMS have standing in this court even to make the invalidity-of-transfer arguments they are making, as will be discussed *infra*.

The parties themselves have not briefed the transfer choice-of-law issue.

and signed by the owner of the rights conveyed . . . ." *Id.* Despite essentially acknowledging that the transfer would have failed under § 204(a) had it been challenged by the transferor, the court refused to hold the transfer invalid under that provision because there was no dispute between the transferor and transferee as to the validity of the transfer.[43] *See id.* Specifically, the court wrote that in light of the fact that "the purpose of the provision is to protect copyright holders from persons mistakenly or fraudulently claiming oral licenses," "[i]n this case, in which the copyright holder appears to have no dispute with its licensee on this matter, it would be anomalous to permit a third party infringer to invoke this provision against the licensee." *Id.*

*Eden Toys* has been followed repeatedly in this circuit and in others. *See Arthur A. Kaplan Co., Inc. v. Panaria Int'l, Inc.,* 1998 WL 603225, 1998 U.S. Dist. LEXIS 14360 at *6 (S.D.N.Y.1998) (refusing to analyze the validity of assignment agreements at the behest of the defendant where the assignor and assignee were in agreement that an assignment had taken place); *Intimo, Inc. v. Briefly Stated, Inc.,* 948 F.Supp. 315, 318 (S.D.N.Y.1996) (finding that plaintiff had standing to pursue copyright infringement action based on an amended assignment signed just a few days before the trial was to begin); *Hart v. Sampley,* 1992 WL 336496, 1992 U.S. Dist. LEXIS 21478 at *4 (D.D.C.1992) ("Even if, as defendants suggest, the transfer was in some way defective, the defendants would not have standing to challenge the validity of the transfer because they were not parties to the agreement."); *see also* Mem. Law Supp. Pls.' Mot. Sum. J. and Opp. Defs.' Mot. Sum. J. [hereinafter "Pls.' Sum. J. Mot."] at 18 (listing further relevant cases).

Defendants and FSUESMS protest that "[FSUESMS] is not an infringer or a stranger to these works, but seeks judicial recognition of its own rights in the works. The *Eden Toys* line of cases is thus inapposite, and plaintiffs' failure to provide a written 'instrument of conveyance' as required under § 204(a) cannot be excused." [44] Jnt. Reply at 7. However, the holding and logic of *Eden Toys* cannot rationally be limited to rooting out challenges by copyright infringers to transfers between transferors and transferees. The Second Circuit in *Eden Toys* explicitly premised its holding on the purpose behind § 204(a), viz., to prevent would-be-transferees from taking advantage of copyright holders. That concern simply does not apply to the facts of this case.

Insofar as FSUESMS was contesting the transfer of the copyrights from the state enterprise Soyuzmultfilm to the lease enterprise Soyuzmultfilm, it was well within its rights, since it was claiming to be the state enterprise Soyuzmultfilm and had staked a claim to the film copyrights. But FSUESMS is in no position to protest the legitimacy of the assignment of rights to plaintiff FBJ, since, even if that transfer were illegitimate, the international distribution rights to the films in question would have remained with the lease enterprise and gone over to the joint stock company SMS when the lease enterprise reorga-

---

**43.** A subsequent formal writing by the copyright owner had also confirmed the transfer, but this fact was not essential to the court's disposition. *See id.*

**44.** It should be noted that plaintiff FBJ claims that its conveyance documents are in accordance with the appropriate formalities. "Plaintiffs believe that said agreements are clear and unambiguous. Even if there are ambiguities, the parties to the aforesaid contracts have cleared up any ambiguities." Pls.' Sum. J. Mot.

nized itself as SMS in 1999. Allowing FSUESMS now to contest the validity of the agreement between the lease enterprise and FBJ when there is no disagreement between the transferor and transferee as to the validity of the transfer would be no different than allowing an infringer to make the same challenge. Or rather, it would be even more foolhardy, since the infringer, at least, stands to benefit if a plaintiff in a given lawsuit is stripped of its standing to sue,[45] which is not true of FSUESMS, its claim of right being in no way dependent upon or related to the invalidity of the transfer. Seen another way, FSUESMS would be no closer to obtaining its proposed relief, a declaration of its status as a legitimate copyright holder, if the transfer from the lease enterprise to FBJ were declared invalid.

### (5)

■ Defendants and FSUESMS make one final argument that must be addressed at this time. 17 U.S.C. § 410(a) explains the significance of the certificate of copyright registration:

When, after examination, the Register of Copyrights determines that, in accordance with the provisions of this title, the material deposited constitutes copyrightable subject matter and that the other legal and formal requirements of this title have been met, the Register shall register the claim and issue to the applicant a certificate of registration under the seal of the Copyright Office. The certificate shall contain the information given in the application, together with the number and effective date of the registration.

17 U.S.C. § 410(a) (1976). 17 U.S.C. § 410(c), in turn, explains the relevance of copyright registration to judicial proceedings: "[i]n any judicial proceedings the certificate of a registration made before or within five years after first publication of the work shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate." 17 U.S.C. § 410(c) (1976). § 410(c) applies to Form GATT registration certificates covering "restored" foreign copyrights as well as domestic works. Here, it is undisputed that the plaintiffs registered the works at issue more than five years after the date of initial publication, and defendants desire, accordingly, to put the plaintiffs to their proof, requiring them to show the validity of the copyrights.

The final sentence of 410(c), however, specifically provides that "[t]he evidentiary weight to be accorded the certificate of registration made [not within five years after first publication of the work] shall be within the discretion of the court." *Id.* As plaintiffs note,

[i]t is particularly appropriate that the Court [exercise its discretion to presume the validity of the copyrights] in this action because plaintiffs presented the "Goskino certificates" exhibiting that the State Enterprise was the producer of the motion pictures, as part of the exhibits to the Declaration of Herman Sinitzyn submitted in connection with the preliminary injunction; the items in question are clearly copyrightable in that they are animated films (Skuliabin Declaration); defendants' exact copies of said videos have already been submitted to the Court in connection with the contempt proceedings and exhibit the originality of plaintiffs' works; and defendants and FSUE are not contesting the ability of someone to assert copyright ownership in said films because they are also seeking rights in the same films.

---

**45.** The defendants here would not even be able to enjoy this benefit, since SMS, the successor to the lease enterprise, is also a plaintiff to this action.

Mem. Law. Supp. Pls.' Mot. Sum. J. and Opp. Defs.' Mot. Sum. J. at 23, n.5. For substantially these reasons, the plaintiffs copyrights will be presumed valid.

## Conclusion

The plaintiffs have shown, to the satisfaction of this court, that the copyrights in the state enterprise Soyuzmultfilm Studio's substantial film library passed, in 1989, to the lease enterprise Soyuzmultfilm Studio and, by agreement, have been assigned to FBJ for international distribution. The lease enterprise Soyuzmultfilm Studio received them by operation of law when the state enterprise was reorganized into the lease enterprise and ceased to exist. Accompanying Perestroika reforms gave the lease enterprise robust rights in connection with those copyrights, clearing up any ambiguity that may have existed about the division of what American jurists would think of as copyright ownership rights between the state and the state enterprise. The lease enterprise entered into an agreement with plaintiff Films by Jove, Inc. for the latter organization to enjoy exclusive rights of international distribution, which organization then expended over three million dollars to develop those rights. Later, in 1999, the copyrights themselves passed to plaintiff SMS when the lease enterprise was reformed into a joint stock company still bearing the Soyuzmultfilm Studio name.

Defendants and FSUESMS have suggested a dramatically different version of events. According to them, the copyrights belonged to the state *ab initio*, could never have passed to the lease enterprise or, in turn, to the plaintiffs and now belong to FSUESMS, which is claimed to be the same entity as the state enterprise Soyuzmultfilm Studio, returned to claim its rights after a ten-year period of hibernation. Unfortunately for FSUESMS, and for the defendants, "facts," as Josef Stalin, who would know, having gone to great lengths to obscure them, once said, "are obstinate things." *Taglines Galore,* http://www.taglinesgalore.com/tags/f.html. The undisputed facts—that the state enterprise did not undertake a single act, either official or unofficial, to which anyone can point between 1989 and 1999, that the state enterprise did not file its "amended" charter as a federal state unitary enterprise, which, it claimed, was an act undertaken in response to the abolition of the "state enterprise" form of organization by the Civil Code of the Russian Federation, First Part, in 1994, until a full five years later, that significantly, between 1992 and 1999, neither the state enterprise nor Goskino nor anyone else had challenged the lease enterprise's 1992 distribution agreement with Films by Jove—these undisputed facts and the law belie FSUESMS's version of the story.

Accordingly, summary judgment is granted in favor of the plaintiffs. A judgment of contempt will be entered against the defendants. Furthermore, FSUESMS's third-party plaintiff complaint is dismissed, and its request for a declaration that it has operative management over what it claims to be Russian-state-owned copyrights in the animated films created by the state enterprise Soyuzmultfilm Studio is denied. Plaintiffs shall submit a proposed judgment on notice.

SO ORDERED.